BEDROCK FOUNDATIONS, INC., A CORPORATION OF NEW YORK, AND SAUL T. GRAND (JOINT VENTURE), PLAINTIFFS-RESPONDENTS, v. GEO. H. BREWSTER & SON, INC., A CORPORATION OF NEW JERSEY, DEFENDANT-APPELLANT AND THIRD-PARTY PLAINTIFF-RESPONDENT, v. MORRIS GOODKIND, KARL T. THOMAS, CURTIS D. WELLER AND LAWRENCE PETERSEN, THIRD-PARTY DEFENDANTS-APPELLANTS.

Argued September 28, 1959—Decided November 9, 1959.

*Mr. John J. Breslin, Jr.,* argued the cause for defendant-appellant and third-party plaintiff-respondent (*Messrs. Breslin & Breslin,* attorneys).

*Mr. David M. Satz, Jr.,* Deputy Attorney General, argued the cause for third-party defendants-appellants (*Mr. David D. Furman,* Attorney General of New Jersey, attorney).

*Mr. Joseph Bigel* argued the cause for plaintiffs-respondents (*Messrs. Bruck and Bigel,* attorneys).

The opinion of the court was delivered by

JACOBS, J. The Law Division denied motions for summary judgment by the defendant Geo. H. Brewster & Son, Inc. and the third-party defendants Morris Goodkind *et al.* Their appeals, pursuant to leave, are now before this court.

In March 1955 the State Highway Department entered into a contract with the corporate defendant (Brewster) for certain construction on Route 42, Section 12–B, North-South Freeway, from Station 212 to Route U. S. 130. In May 1955 Brewster subcontracted to the plaintiffs (Bedrock) the job of installing pilings in conjunction with three

bridge projects along the route. The subcontract incorporated by reference the conditions of the main contract between Brewster and the Highway Department and the Department's Standard Specifications and Supplementary Specifications for Road and Bridge Construction. Bedrock began its pile driving operations using a No. 1 Vulcan Steam Hammer and when it had driven the timber piles to a depth of 15 feet it states that it reached a point of "practical refusal" which it defines as the point the piles could no longer be struck by the hammer without splintering and "brooming." The third-party defendant Goodkind, who was then Director and Chief Bridge Engineer of the State Highway Department, was of the opinion that the safety of the bridge being constructed required a penetration of 25 feet rather than 15 feet. He directed that if necessary to obtain such penetration, a water jet in combination with the pile hammer be used. That was done, the penetration of 25 feet was obtained, and the work was completed.

Bedrock claimed that the extra penetration of 10 feet entailed additional labor and materials not contemplated by its subcontract with Brewster and for which it was entitled to extra compensation. Brewster submitted the claim to the Highway Department which rejected it in a letter dated March 23, 1956. Thereafter Bedrock filed a complaint in the Law Division against Brewster. In its first count it sought recovery of $20,917.63 on a book account. This amount was subsequently paid and the count was dismissed. In its second count it sought a contract or *quantum meruit* recovery of $58,502.71 for the extra work done and extra material furnished to obtain the increased penetration. In its third and fourth counts it repeated its claim of $58,502.71 alleging that Brewster had "illegally, arbitrarily and fraudulently" required it to perform the extra work and furnish the extra material and had arbitrarily, illegally and fraudulently conspired with representatives of the Highway Department to prevent it from completing its contract until it performed the extra work and furnished the extra material.

On April 24, 1957 Bedrock filed an amended complaint which undertook to specify the alleged illegal, arbitrary and fraudulent conduct and which designated the representatives of the Highway Department as Morris Goodkind, aforementioned, Karl T. Thomas, Senior Bridge Inspector, Curtis D. Weller, District Bridge Engineer, and Lawrence Petersen, Director and Chief Bridge Engineer.

Brewster filed an answer and counterclaim in which it alleged that Bedrock had not performed its subcontract and had instituted its action maliciously and without foundation. Thereafter Bedrock moved for an order granting summary judgment and striking the counterclaim but its motion was denied. Brewster then moved for leave to file a third-party complaint against Goodkind, Thomas, Weller and Petersen alleging that the extra work done and extra material furnished by Bedrock was at their insistence and that they should consequently pay any judgment which might be entered in favor of Bedrock against Brewster. The motion to file the third-party complaint was granted and was followed by a motion for summary judgment by the third-party defendants. The trial court denied their motion and leave to appeal was granted to them by the Appellate Division. While their appeal was pending, this court certified it on its own motion and suggested that Brewster move for summary judgment in the trial court. Brewster did so but its motion was denied and it thereafter took an appeal which has been argued in this court along with the appeal of the third-party defendants.

Brewster contends that under the terms of the subcontract, Bedrock was not entitled to any extra compensation for the penetration from 15 to 25 feet. It refers primarily to Article 4.4.3 of the Standard Specifications which reads, in part, as follows:

"Foundation piles have been designed to carry a certain load, and a certain pile length, based on available information of the subsurface conditions, has been assumed in preparing the estimate of quantity. All piles, however, unless otherwise directed, shall be driven to practical refusal as determined by the Engineer, and the

contractor shall determine the actual length of untreated timber piles required by driving test piles of greater length than that assumed in the estimate."

Brewster points out that Bedrock's subcontract lists the various linear footages which are the total lengths of the various types of piling called for by the contract and that by dividing this figure by the number of piles to be driven the approximate length of the piles is readily computed to be approximately 25 feet; and it stresses the Engineer's determination that the contemplated penetration of 25 feet was necessary for the safety of the bridge. On the other hand Bedrock points out that Article 4.4.3 provides that "Timber piles shall be driven with a gravity or a steam hammer or, if permitted by the Engineer with a combination of hammer and water jet" and that the timber piles in the instant matter were driven by hammer to 15 feet, a point of practical refusal; it contends that the Engineer did not determine that the 15 feet was not a point of practical refusal but directed a deeper penetration notwithstanding that practical refusal had been obtained.

Brewster places additional reliance on provisions in the Supplemental Specifications which Bedrock contends are inapplicable. It refers to Article 4.4.3 which contains a provision that "All concrete piles are to be driven with a steam hammer having a capacity sufficient to produce a penetration satisfactory to the Engineer," and also a provision that "If the required penetration cannot be obtained by the use of a hammer the contractor shall provide for jetting at his own expense." Bedrock contends that these provisions apply only to concrete piles and have no application to timber piles. Article 4.4.4 provides that "The contractor shall not make any claim for additional compensation due to any increase or decrease in listed quantity of bearing piles or due to the use of water jets in driving piles." Bedrock contends that this Article was merely intended to prevent extra compensation if water jet was used to perform the terms of the contract; thus, if water jet were used to reach

practical refusal it could not seek added compensation but, it urges, it would be entitled to compensation for proceeding beyond practical refusal "whether water jet, hammer or pick or shovel were used."

Although Bedrock urges that practical refusal, as used in the Specifications, means the point at which the piles could no longer be struck by the hammer without brooming, the Attorney General advances a different meaning. He states that practical refusal if done with a hammer "might mean one particular depth as a result of test determining a certain minimum penetration with a given number of blows" whereas if jetting is used "practical refusal can be reached at any depth." He suggests that Article 4.4.3 "calls for penetration to the point of practical refusal as a mere adjunct to the over-all requirement of penetration to the particular depth as required by needs of safety." Unfortunately, the Specifications contain no definition whatever of practical refusal and the materials before us on the motions for summary judgment do not embody suitable testimony as to the pertinent trade customs, usages and meanings. Brewster contends that the provision in Article 4.4.3 to the effect that the piles shall, "unless otherwise directed," be driven to practical refusal as determined by the Engineer placed on Bedrock the responsibility of making, without claim for extra compensation, additional penetration when directed by the Engineer; *per contra* it has been urged that the responsibility of Bedrock under Article 4.4.3 was to reach practical refusal although the Engineer might direct a lesser penetration when he found that sufficient.

The Law Division judge suggested that under Brewster's contention Bedrock assumed "an apparently limitless performance in consideration of a fixed sum." He raised question as to whether that was the design and expressed the view that the Specifications were ambiguous and that "the intent of the parties must be left to factual determination." He concluded that final disposition of the matter on motion for summary judgment would be inappropriate

and (except as hereinafter indicated) we see no just reason for interfering with his determination. In view of the specialized nature of the terminology, evidence introduced at the trial of trade customs, usages and meanings will presumably shed light as to the intention of the parties. See 3 *Williston, Contracts* § 614 (*Rev. Ed.* 1936); 3 *Corbin, Contracts* § 555 (1951); *Fox Film Corp. v. Springer*, 273 *N. Y.* 434, 8 *N. E. 2d* 23 (*Ct. App.* 1937); cf. *United States v. Lennox Metal Manufacturing Co.*, 225 *F. 2d* 302 (2 *Cir.* 1955). And in view of the uncertain meaning of the contractual undertaking by Bedrock, such other pertinent parol evidence as may be offered at the trial in aid of the search for the true intention of the parties may readily be received. See 3 *Williston, supra* §§ 618, 629; 3 *Corbin, supra* § 535 *et seq.* While it is true that construction of the written contract would ordinarily be the court's function, since its meaning is unclear and may depend upon disputed extraneous testimony, submission to the jury may be required. See *Terminal Const. Corp. v. Bergen County, etc., Dist. Authority*, 18 *N. J.* 294, 310 (1955); *Newark Publishers' Assn. v. Newark Typographical Union*, 22 *N. J.* 419, 427 (1956); cf. *Michaels v. Brookchester, Inc.*, 26 *N. J.* 379, 387 (1958).

▮▮ Brewster states that it never directed Bedrock to do the additional penetration but merely served as a conduit for the Engineer's instructions. A letter dated September 2, 1955 was sent by a representative of the Highway Department to Brewster containing a direction that it order piles 25 feet in length and that "if necessary to obtain this penetration, you are to use a water jet in combination with pile hammer." This letter was transmitted by Brewster to Bedrock with the comment "please be guided accordingly." Bedrock asserts, with much force, that this constituted a direction from Brewster to it that it proceed with penetration to 25 feet. It also asserts that it protested the direction but was assured by a representative of Brewster that if it would proceed and obtain the additional penetration it would be paid for the

extra work done. Brewster questions the authority of its representative, identified as Mr. Moore, a project manager associated with Brewster and employed by it for approximately 30 years, and contends that, in any event, its promise would not be binding for lack of legal consideration. See *Joseph Lande & Son, Inc. v. Wellsco Realty, Inc.,* 131 *N. J. L.* 191, 196 (*E. & A.* 1943); *Durant v. Block,* 113 *N. J. L.* 509, 512 (*E. & A.* 1934). But if Moore made the promise and had apparent authority to act for Brewster, the absence of any express authority would not be fatal. See *Erie R. R. Co. v. S. J. Groves & Sons Co.,* 114 *N. J. L.* 216, 219 (*E. & A.* 1934); *Ross v. Realty Abstract Co.,* 50 *N. J. Super.* 147, 154 (*App. Div.* 1958). And if there was a *bona fide* dispute between Bedrock and Brewster as to its obligation to proceed with the additional penetration and Bedrock did proceed in reliance on Brewster's promise that Bedrock would be paid for its extra work, there was sufficient legal consideration to support the promise. See 1 *Williston, Contracts* § 130, p. 536 (*3d ed.* 1957); 1 *Corbin, Contracts* § 187, *p.* 611 (1950); cf. *Second Nat. Bank of Paterson v. Curie,* 116 *N. J. Eq.* 101, 107 (*E. & A.* 1934); *Military College Co. v. Brooks,* 107 *N. J. L.* 28, 30 (*Sup. Ct.* 1929).

■■ In the consideration of Brewster's motion for summary judgment, Bedrock was entitled to the benefit of all favorable inferences which might be drawn from the papers submitted to the Law Division judge and was entitled to a denial of the motion in the absence of a clear showing that there was no genuine issue as to any material fact alleged. See *Judson v. Peoples Bank & Trust Co. of Westfield,* 17 *N. J.* 67, 75 (1954); *Templeton v. Glen Rock,* 11 *N. J. Super.* 1, 4 (*App. Div.* 1950). The papers raised questions not only as to the proper interpretation of the contract but also as to the alleged promise by Brewster, the express or apparent authority of Moore to make it, and the legal sufficiency of the consideration for it. Under the circumstances, the Law Division judge acted well within his authority in declining to grant summary judgment

insofar as count two of the complaint was concerned and that count will be remanded for trial. *Cf. Moore's Federal Practice* 2169, 2170 (*2d ed.* 1953).

██ Although Bedrock's contract or *quantum meruit* claim is to proceed to trial we agree with Brewster's contention that the third and fourth counts should not be permitted to stand. While they seek to re-enforce Bedrock's claim for extra compensation in the sum of $58,502.71 on tort theories, they add nothing of substance when they are considered in the light of the record before us, viewed most favorably to Bedrock. Bedrock's basic position is that it performed its contract fully when it penetrated to 15 feet and that although Brewster knew Bedrock had performed its contract it ordered Bedrock to proceed to 25 feet and promised to pay the reasonable value of the extra work performed and materials furnished. It acknowledges that Brewster's orders were in fulfillment of the instructions received from the Engineer and it acknowledges further that the Engineer acted in entire good faith and in the conscientious belief that the safety of the bridge being constructed required the additional penetration. Under these circumstances the charges of fraud, illegality, arbitrariness and conspiracy, with their sinister implications, have no fair place in the proceeding. If Bedrock's basic position is sound it is wholly justified in seeking recovery for its extra performance in contract or *quantum meruit;* but in the light of the conceded fact that Brewster was acting on instructions from the Engineer who in turn was acting in good faith, its assertion of fraud and the related tort charges are not warranted.

██ Bedrock states that "the theory and nature" of its charge of fraud is supported by *Terminal Const. Corp. v. Bergen County, etc., Dist. Authority, supra.* There the Terminal Construction Corporation had contracted with the Bergen County Sewer Authority to perform certain work in the construction of a sewage treatment system. A dispute arose between Terminal and the engineer as to the work

done and the sum due. No claim for personal liability on the part of the engineer was advanced by Terminal, but it did institute an action against the Authority alleging completion of its work for the Authority and charging that the engineer had acted fraudulently in his determinations and in his refusal to approve payment of the sum allegedly due to Terminal from the Authority. In the course of its opinion by Justice Burling, this court discussed the effect of the engineer's action and held that if it was arbitrary, or without reason, or the result of gross mistake, it would be deemed to constitute "constructive fraud" and would not bar Terminal's claim against the Authority. As has been pointed out elsewhere, constructive fraud is not fraud at all but is descriptive of conduct which may in the eyes of the law give rise to certain consequences ensuing upon actual fraud; perhaps the law would be better off without the term. See *In re Bowen,* 151 *F.* 2d 690, 691 (3 *Cir.* 1945). In any event, Bedrock asserts that the Engineer never made any determination that the 15 feet was not a point of practical refusal and is at liberty to contend that, if the Engineer did make such determination or otherwise determined that the extra penetration to 25 feet was required by the terms of the contract, his action was without reason or the result of gross mistake. Within the principles expressed in the *Terminal* case, this contention will be fully available to Bedrock under the second count in the event Brewster seeks to rely on the position that Bedrock was bound by the Engineer's determination. That being so, no just purpose will be served by the third and fourth counts and they are hereby ordered dismissed.

We come now to the third-party complaint against the defendants Morris Goodkind *et al.* in which Brewster seeks indemnification from the individual representatives of the Highway Department to the extent of any recovery from it by Bedrock. Brewster does not assert that any of the Department's representatives acted maliciously or in bad faith; on the contrary it acknowledges that they acted in

entire good faith and in the conscientious belief that the safety of the bridge being constructed required the additional penetration. It contends, nevertheless, that since it acted solely in fulfillment of the instructions received from the Department's Engineer, liability for any extra performance beyond the terms of the contract should not ultimately be rested upon it. Much might be· said in favor of the justice and equity of Brewster's position if it were seeking to shift the ultimate responsibility to the Department which was a party to the contract and actually received the benefits of any extra performance. But Brewster is not seeking indemnification from the Department, presumably because of the doctrine of sovereign immunity which it criticizes (see *Taylor v. N. J. Highway Authority*, 22 *N. J.* 454, 470 (1956)) but honors as representative of the law of our State. See *Strobel Steel Const. Co. v. State Highway Comm.*, 120 *N. J. L.* 298 (*E. & A.* 1938); *cf. Gallena v. Scott*, 11 *N. J.* 231 (1953); *Duke Power Co. v. Patten*, 20 *N. J.* 42, 49 (1955). It seeks indemnification from the individual departmental representatives who were neither parties to the contract nor beneficiaries of any extra performance and who were called upon to exercise judgment in the discharge of their supervisory obligations and did so conscientiously. In addition to the Articles which were mentioned earlier in this opinion, the Specifications provided in Articles 1.5.1 and 1.5.2 that the Engineer would furnish Plans and Specifications and give instructions "necessary to attain due and full effect of the provisions of the Specifications"; that his decision on any differences of opinion as to the meaning or intent of the Plans and Specifications would be final and conclusive when approved by the Commissioner; that all materials and work would be subject to his inspection and approval; and that he would have the right to correct "apparent errors or omissions in the Plans and Specifications and to make such interpretations as he may deem necessary for the proper fulfillment of the intent of the Plans and Specifications." Article 1.6.1 provided that in carrying out

the provisions of the contract or in exercising any power or authority granted them by their position there shall be no liability upon the Commissioner, the Engineer or their authorized representatives "either personally or as officials of the State." *Cf. Kuzmiak v. Brookchester*, 33 *N. J. Super.* 575 (*App. Div.* 1955).

During the course of his deposition, Mr. Goodkind testified that in his opinion "the adequacy and safety of the structure" required the penetration of 25 feet; that his determination was based "on good engineering practice and requirements of specifications, both"; and that "the piles as driven to 15 feet would have been equivalent to unsupported stilts" and "might have proven dangerous" to the traveling public. Mr. Thomas testified that in his opinion there was insufficient lateral support when the 15-foot mark was reached. Mr. Weller testified that driving the piles to 15 feet did not give the "desired penetration" and that in view of the soft overlying materials they would be "piles on stilts with no lateral stability." He also testified that from test piles and borings it was determined that 25 feet "would be an adequate penetration." Brewster does not question any of the foregoing and on the record before us there can be no dispute that in directing the additional penetration the Department's Engineer acted at least within the color of his official powers and responsibilities and his broad supervisory powers and responsibilities under the Specifications, and that his action involved not merely the performance of a so-called ministerial duty (*cf. Florio v. Jersey City*, 101 *N. J. L.* 535 (*E. & A.* 1925); *N. J. S. A.* 40:51–3) but the conscientious exercise of an administrative judgment and discretion. See *Prosser, Torts* 780–784 (*2d ed.* 1955); 2 *Harper and James, Torts* 1632–1646 (1956). Under these circumstances it is clear to us that there could be no just basis, upon any tort principles or otherwise, for imposing upon the Highway Department's individual representatives the heavy burden of personal liability for any money recovery by Bedrock against Brewster. See *Davis, "Administrative*

*Officers' Tort Liability,"* 55 *Mich. L. Rev.* 201 (1956); James, *"Tort Liability of Governmental Units and Their Officers,"* 22 *U. Chi. L. Rev.* 610 (1955); *Jennings, "Tort Liability of Administrative Officers,"* 21 *Minn. L. Rev.* 263 (1937). This being so they should not be subjected to the inconvenience and expense of being continued as parties in the proceeding; their motion for summary judgment should have been granted. See *Judson v. People's Bank & Trust Co. of Westfield, supra,* 17 *N. J.* at *page* 75; *Heljon Management Corp. v. Di Leo,* 55 *N. J. Super.* 306, 312 (*App. Div.* 1959); *Davis, supra* at *page* 233.

The common law soundly recognized an immunity in favor of public officials from civil liability in connection with the performance of their public duties; the most sweeping was that afforded to members of the judiciary who were declared immune from damage actions for their judicial performance even where they were charged with malice or corruption. See *Floyd v. Barker,* 12 *Co. Rep.* 23, 15 *Eng. R. C.* 37; *Scott v. Stansfield, L. R.* 3 *Ex.* 220, 15 *Eng. R. C.* 42 (1868); *Brictson v. Woodrough,* 164 *F.* 2d 107, 109 (8 *Cir.* 1947), cert. denied, 334 *U. S.* 849, 68 *S. Ct.* 1500, 92 *L. Ed.* 1772 (1948); *Jennings, supra* at *page* 271. In *Grove v. Van Duyn,* 44 *N. J. L.* 654 (*E. & A.* 1882), the court held that the immunity extended to a magistrate who acted in a matter which was colorably though not actually within his jurisdiction; in the course of his opinion Chief Justice Beasley succinctly expressed the traditional reason for the sweeping nature of the judicial immunity:

"The doctrine that an action will not lie against a judge for a wrongful commitment, or for an erroneous judgment, or for any other act made or done by him in his judicial capacity, is as thoroughly established as are any other of the primary maxims of the law. Such an exemption is absolutely essential to the very existence, in any valuable form, of the judicial office itself; for a judge could not be either respected or independent if his motives for his official actions or his conclusions, no matter how erroneous, could be put in question at the instance of every malignant or disappointed suitor. Hence we find this judicial immunity has been

conferred by the laws of every civilized people. That it exists in this state in its fullest extent, has been repeatedly declared by our own courts." (44 *N. J. L.* at *page* 656)

The judicial immunity has been extended by many courts to federal and state administrative agents and lesser administrative officials who are called upon to exercise judgment and discretion in somewhat the same manner as does the judiciary. See *James, supra* at *page* 641; *Davis, supra* at *pages* 203–206; *Cooper v. O'Connor*, 69 *App. D. C.* 100, 99 *F. 2d* 135, 118 *A. L. R.* 1440 (*App. D. C.* 1938); *Papagianakis v. The Samos*, 186 *F. 2d* 257 (4 *Cir.* 1950), *cert.* denied, 341 *U. S.* 921, 71 *S. Ct.* 741, 95 *L. Ed.* 1354 (1951); *Taylor v. Glotfelty*, 201 *F. 2d* 51 (6 *Cir.* 1952). In *Gregoire v. Biddle*, 177 *F. 2d* 579 (2 *Cir.* 1949), *cert.* denied, 339 *U. S.* 949, 70 *S. Ct.* 803, 94 *L. Ed.* 1363 (1950), the plaintiff sued two successive attorneys general, two successive directors of the Enemy Alien Control Unit of the Department of Justice and the District Director of Immigration at Ellis Island, charging that they had maliciously and without reasonable or colorable cause conspired to deprive him of his liberty and seeking money damages from them. In sustaining a dismissal of his complaint, the Court of Appeals noted that under the precedents the defendants had an absolute immunity which afforded protection to them against civil damage claims even if they acted unlawfully and were actuated by personal malice. In the course of his opinion for the court, Judge Learned Hand had this to say in modern defense of the full sweep of the immunity:

"It does indeed go without saying that an official, who is in fact guilty of using his powers to vent his spleen upon others, or for any other personal motive not connected with the public good, should not escape liability for the injuries he may so cause; and, if it were possible in practice to confine such complaints to the guilty, it would be monstrous to deny recovery. The justification for doing so is that it is impossible to know whether the claim is well founded until the case has been tried, and that to submit all officials, the innocent as well as the guilty, to the burden of a trial and to the inevitable danger of its outcome, would dampen the ardor of all but

the most resolute, or the most irresponsible, in the unflinching discharge of their duties. Again and again the public interest calls for action which may turn out to be founded on a mistake, in the face of which an official may later find himself hard put to it to satisfy a jury of his good faith. There must indeed be means of punishing public officers who have been truant to their duties; but that is quite another matter from exposing such as have been honestly mistaken to suit by anyone who has suffered from their errors. As is so often the case, the answer must be found in a balance between the evils inevitable in either alternative. In this instance it has been thought in the end better to leave unredressed the wrongs done by dishonest officers than to subject those who try to do their duty to the constant dread of retaliation. Judged as *res nova*, we should not hesitate to follow the path laid down in the books." (177 *F.* 2d at *page* 581)

See *Hardy v. Vial*, 48 *Cal.* 2d 577, 311 *P.* 2d 494, 66 *A. L. R.* 2d 739 (*Sup. Ct.* 1957), commented upon in 5 *U. C. L. A. L. Rev.* 164 (1958).

Professor Davis has questioned whether the interests of justice really require that the immunity extend to cases where the exercise of judgment and discretion by the administrative official is actuated by personal ill will or malice rather than by a conscientious discharge of public duty. See *Davis, supra* at *page* 220; *cf. Harper and James, supra* at *page* 1645. And the New Jersey courts, while applying the immunity to cases where the administrative official exercised his judgment and discretion in good faith, have consistently indicated that the immunity would be inapplicable where the administrative official's action was actuated by malice or bad faith. Thus in the leading case of *Valentine v. Englewood*, 76 *N. J. L.* 509 (*E. & A.* 1908) the Court of Errors and Appeals held that the members of a board of health who, acting in good faith, had quarantined the plaintiff's house, could not be held civilly responsible if they erred as to the presence of a contagious disease. In the course of his opinion for the court, Justice Swayze noted that, where there was no "fraud or malice," the overwhelming weight of authority favored the immunity as to all public officers "who are called upon in behalf of the public to exercise their judgment"; and, rejecting the views expressed

by Justice Holmes in *Miller v. Horton,* 152 *Mass.* 540, 26 *N. E.* 100, 10 *L. R. A.* 116 (*Sup. Jud. Ct.* 1891), he concluded that the immunity applied even if the matter was "colorably, though not really" within the board's jurisdiction.

In *Johnson v. Marsh,* 82 *N. J. L.* 4 (*Sup. Ct.* 1912) the former Supreme Court held that the individual members of the Board of Protectors of Franklin Township could not be held responsible in a libel action for having erroneously placed the plaintiff's name on a list of habitual drunkards; Chief Justice Gummere stated that it was settled in this State that the members of a public board acting in the performance of their duties could not be held personally liable in a civil action for damages "providing what they do is done in good faith." In *Tyrell v. Burke,* 110 *N. J. L.* 225 (*E. & A.* 1933) this language was repeated in an opinion which ordered the dismissal of an action against the individual members of the Board of Embalmers and Funeral Directors who had declined to issue a license to the plaintiff; Justice Lloyd pointed out that while the plaintiff's proofs disclosed that the members of the board had been ignorant of their duties and perhaps also negligent in their performance, they did not indicate any "malice or bad faith." In *Lincoln Bus Company v. Jersey Mut., etc., Co.,* 10 *N. J. Misc.* 1114 (*Ch.* 1932) Vice Chancellor Backes noted that the Commissioner of Banking and Insurance could not be held personally liable because of "an honest mistake" in the performance of his duties. In *R. A. Realty Corp. v. Pennsylvania R. R. Co.,* 16 *N. J. Misc.* 537 (*Sup. Ct.* 1938) Judge Leyden, in striking counts in a complaint which sought damages from the members of the Board of Public Utility Commissioners, specifically noted that they acted in a matter at least colorably within their jurisdiction and that the complaint contained no allegation that they were actuated by motives of "private gain, oppression or bad faith."

In *Hester v. Miller*, 8 *N. J.* 81 (1951) the State Highway Commissioner had entered the plaintiff's land and had instituted condemnation proceedings. The plaintiff brought an action challenging the appointment of condemnation commissioners and seeking damages personally from the State Highway Commissioner for the trespass upon his land and his eviction therefrom. The Law Division set aside the condemnation proceedings but rendered judgment in favor of the Commissioner individually. On appeal, this court sustained the judgment in favor of the Commissioner individually, pointing out that there was not the "slightest evidence of fraud or malice" on the part of the Commissioner and that "the matter involved was at least colorably within his jurisdiction." Justice Oliphant's opinion noted that under such circumstances the Commissioner could not be held personally liable even if the original taking of the plaintiff's land was without legal authority; and it expressed the rule in our State to be that "where there is no fraud or malice a public officer is exempt from civil action when called upon in behalf of the public to exercise his discretion."

Apart from his other official powers and responsibilities, the Department's Engineer was expressly vested by the terms of the Specifications with powers which were, in their nature, arbitral. The authorities recognize that arbitrators and others with comparable powers are generally immune from civil damage claims based on their exercise of those powers, at least where they act in good faith. See *Stevenson v. Watson*, 4 *L. R. C. P.* 148 (1879); *Chambers v. Goldthorpe*, [1901] 1 *K. B.* 625; *Hutchins v. Merrill*, 109 *Me.* 313, 84 *A.* 412, 42 *L. R. A., N. S.*, 277 (*Sup. Jud. Ct.* 1912); *Wilder v. Crook*, 250 *Ala.* 424, 34 *So.* 2d 832 (*Sup. Ct.* 1948). In the *Stevenson* case a building contract was entered into between Stevenson, the builder, and Weston, the owner. The contract provided that the architect, Watson, could order additions or deductions, that all disputed questions arising during the construction of the building would be determined by the architect, and that the builder would be paid on the

certificate of the architect. The architect did order additions and deductions and after the building was completed certified the net balance due to Stevenson. Alleging that the architect did not use due care and skill in his determinations, the builder sued the architect for damages. In entering judgment for the architect, the court pointed out that the architect's functions were not ministerial but required the exercise of discretion and judgment, that he was not charged with any fraud or collusion, and that he could not be held accountable in damages for the exercise of his honest judgment even though his judgment was an erroneous one. Denman, J. expressed the view that the architect's duties were "very analogous to the duties of an arbitrator" and that he undertook no "duty amounting to more than that of honestly performing his functions." See *Finnegan v. Allen*, [1943] 1 *K. B.* 425.

In *Wilder v. Crook, supra* [250 *Ala.* 424, 34 *So.* 2d 834], the court noted that the engineer employed by the City of Atmore to supervise its contract with L. F. Wilder for the construction of installations in connection with its water system "was placed in a position somewhat analogous to that of an umpire or arbitrator," that his decisions were "judicial in nature," and that under the cases he could not be held liable in damages "for failure to exercise care or skill in the performance of his functions." It then referred to other authorities (3 *Am. Jur.* 928 (1926); 6 *C. J. S. Arbitration and Award* § 53, *p.* 194 (1937)) which suggest that the immunity would be applicable even where fraud or corruption is charged but we need not deal with them for in the instant matter there is not the slightest intimation of any dishonesty or lack of good faith. Under the circumstances the public policy considerations as well as the precedents weigh overwhelmingly in favor of immunizing the Department's Engineer and his departmental associates from any personal liability because of the exercise of their professional judgment in directing the extra penetration as necessary to insure the stability and safety of the bridge.

The judgment of the Law Division denying Brewster's motion for summary judgment insofar as the second count of the complaint is concerned is affirmed and the cause is remanded for trial on that count; the third and fourth counts of the complaint are ordered dismissed; and the denial of the motion by the third-party defendants for summary judgment on the third-party complaint is reversed. No costs.

*For affirmance in part and reversal in part*—Chief Justice WEINTRAUB, and Justices BURLING, JACOBS, FRANCIS, PROCTOR, HALL and SCHETTINO—7.