## PRINCETON INSURANCE COMPANY,

v.

## CONVERIUM REINSURANCE (NORTH AMERICA) INC., Appellant.

### No. 08–2136.

United States Court of Appeals, Third Circuit.

Argued March 12, 2009.

Filed: Sept. 14, 2009.

Thomas S. Novak (Argued), Joshua N. Howley, Sills Cummis & Gross P.C., Newark, NJ, for Appellant.

William E. McGrath, Jr. (Argued), Smith, Stratton, Wise, Heher & Brennan, LLP, Princeton, NJ, for Appellee.

Before: FUENTES, CHAGARES, TASHIMA,* Circuit Judges.

## OPINION

TASHIMA, Circuit Judge:

Defendant–Appellant Converium Reinsurance (North America), Inc. ("Converium") appeals the District Court's grant of summary judgment in favor of Plaintiff–Appellee Princeton Insurance Co. ("Princeton"). The District Court ruled that Converium was liable for $1.5 million, plus $207,000 interest, under the terms of its workers' compensation and employers' liability ("EL") reinsurance treaty with Princeton. We will vacate the judgment of the District Court and remand.

## I.

Because we write for the parties, we recite only those facts necessary to our analysis of the issue presented on appeal.

Princeton and Converium signed a contract (the "Reinsurance Treaty" or the "Treaty") in 1995, according to which Con-

* The Honorable A. Wallace Tashima, Senior United States Circuit Judge, United States Court of Appeals for the Ninth Circuit, sitting by designation.

verium agreed to provide reinsurance to Princeton on Princeton's workers' compensation insurance policies. The contract was drafted by First Reinsurance Intermediaries Corp. ("First Re"), which acted as an agent of Princeton.

In the Treaty, Converium agreed that it would reimburse Princeton's workers' compensation and EL claims on an excess loss basis. If a claim exceeded $1 million, Converium would reimburse Princeton's additional costs, up to a maximum liability of $1.5 million. For example, if an insured party made a claim to Princeton for $500,000, Converium would owe nothing because the liability would not exceed the $1 million threshold. If an insured party made a claim for $2.5 million or more, Converium would pay Princeton the maximum $1.5 million provided under the Treaty. Most important for the case at bench, payments under the treaty were "subject to," among other provisions, "warranties of ARTICLE V." Article V included four warranties, one of which read as follows: "[Princeton] warrants that the maximum Employers' Liability limits are as follows, or so deemed: i. Bodily Injury by Accident-$100,000 each accident...." The $100,000 limit was subsequently increased to $500,000. Initially, the Treaty covered only policies written in New Jersey, but it was later expanded to include other states, including New York, which was added in March, 1998.

In August, 1998, Princeton issued an insurance policy to 1 st Choice Metal & Steel Co., Inc. ("1 st Choice Metal"). The policy included a $100,000 limit for EL claims, but unbeknownst to Princeton, this limit was unenforceable under New York law. In September, 1998, Xing Zhang, the president and an employee of 1st Choice Metal, suffered a catastrophic injury when he fell while working on the roof of a building in Brooklyn. He filed a claim for workers' compensation under his policy

with Princeton, and he also sued the owner of the house for damages in New York state court. The owner of the house filed a third-party complaint against 1 st Choice Metal for indemnification. In most circumstances, the workers' compensation claim would preclude Zhang from filing an additional suit, but the state court ruled that because Zhang may have been "gravely injured" while working on a multifamily dwelling, he was permitted to sue under New York law. Because this suit was outside the workers' compensation system, Princeton was liable under its EL policy, and because the policy was written in New York, the $100,000 limit on coverage was unenforceable. Princeton settled the case in 2002 for $4.4 million. The settlement provided that it would "fully and finally dispose of [Zhang's] workers' compensation claim, as well as the matter pending before the Court." The settlement did not require that Zhang refrain from filing future workers' compensation claims, but provided that any subsequent workers' compensation claim would be "subject to a credit in an amount equal to the net recovery from this settlement." Presumably, if Zhang were awarded workers' compensation benefits in excess of the settlement amount, he would be able to recover additional money from Princeton in the excess amount. The lawyers who recommended this form of settlement regarded the possibility of future workers' compensation payments to Zhang as remote: they told Princeton that, with this settlement, "further liability before the Workers' Compensation Board is terminated."

Princeton filed a claim with Converium, which Converium denied twice—in September, 2003, and again in August, 2004. Converium cited the warranty provision of the Treaty and argued that it was responsible for only $500,000 in EL coverage. Up to that point, Zhang had recovered less than $300,000 in workers' compensation

benefits. Because Converium was liable only for claims in excess of $1 million, it claimed that it did not owe Princeton anything under the treaty. Princeton disagreed and sued in New Jersey state court. Converium removed the case to federal court and filed a counterclaim, asking for a declaratory judgment that it was free of liability to Princeton. Both parties moved for summary judgment. The district court granted Princeton's motion, and Converium appealed.

## II.

The District Court had jurisdiction pursuant to 28 U.S.C. § 1332, and we have jurisdiction pursuant to 28 U.S.C. § 1291. We review the District Court's grant of summary judgment de novo, applying the same standard that the District Court used. *Lawrence v. City of Philadelphia,* 527 F.3d 299, 310 (3d Cir.2008). That is, we view the evidence in the light most favorable to the party opposing summary judgment and draw all justifiable, reasonable inferences in its favor. *Id.* We will affirm if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that [Princeton] is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The same standard applies when there are cross-motions for summary judgment. *Lawrence,* 527 F.3d at 310.

## III.

### A.

The first question we must address is choice of law. The case was filed in New Jersey, but it involves conduct in both New York and New Jersey, and the Treaty does not include a choice-of-law provision. The District Court applied New Jersey law because it saw no difference affecting the outcome of the case whether New York or New Jersey law applied.

*See Lebegern v. Forman,* 471 F.3d 424, 428 (3d Cir.2006) (noting that under New Jersey law, if the outcome of a case would be the same under New Jersey law and that of another state, New Jersey law applies).

We agree with the District Court on this point. Both New York and New Jersey apply the same principles of contract law relevant to this case. In both states, whether a contract is ambiguous is a question of law. *Grow Co. v. Chokshi,* 403 N.J.Super. 443, 959 A.2d 252, 272 (N.J.Super.Ct.App.Div.2008); *Kass v. Kass,* 91 N.Y.2d 554, 673 N.Y.S.2d 350, 696 N.E.2d 174, 180 (1998). Only if a court determines that a contract provision is ambiguous—that is, that it is subject to at least two reasonable interpretations—should the issue be left to a jury. *Bedrock Founds., Inc. v. George H. Brewster & Son, Inc.,* 31 N.J. 124, 155 A.2d 536, 541 (1959); *State v. Home Indem. Co.,* 66 N.Y.2d 669, 495 N.Y.S.2d 969, 486 N.E.2d 827, 829 (1985).

There is one difference between New Jersey and New York law relevant to this case, but it ultimately has no effect on our decision. Under New York law, "[a]mbiguity is determined by looking within the four corners of the document, not to outside sources." *Kass,* 673 N.Y.S.2d 350, 696 N.E.2d at 180. A court should not consider the meaning of contract terms in isolation, but rather in the context of the document as a whole and the circumstances in which it was executed, attempting to understand the parties' intentions as expressed in the document. *Id.* at 180–81. New Jersey law appears to take a somewhat broader view. Extrinsic facts may be considered, albeit "only for the purpose of interpreting the writing—not for the purpose of modifying or enlarging or curtailing its terms, but to aid in determining the meaning of what has been said." *Atl. N. Airlines v. Schwimmer,* 12 N.J. 293, 96

A.2d 652, 656 (1953). Because we conclude that the contract is ambiguous on its face, and that extrinsic evidence does not unequivocally resolve the ambiguity, this distinction is not determinative.

### B.

The central issue in this case is whether the warranty provision in the Treaty limits Converium's liability for EL claims. The District Court held that the contract was unambiguous and contained no such limitation. The District Court pointed out that the central contract provision that created liability for Converium occurred in Article III, in which Converium agreed

> to reimburse [Princeton], on an excess of loss basis, for the amount of ultimate net loss which [Princeton] may pay as a result of losses ... covering Workers' Compensation and Employers' Liability classes of business as identified in APPENDIX A, subject to the underwriting criteria of ARTICLE IV, the underwriting guidelines of APPENDIX B, warranties of ARTICLE V and exclusions of ARTICLE VI.

The Treaty defined "ultimate net loss" as "the sum actually paid by [Princeton] in settlement of losses for which it is held liable." This was in turn limited so that Converium "shall not be liable for any loss until [Princeton's] ultimate net loss in each occurrence exceeds $1,000,000 and then [Princeton] shall be liable for the amount of [Princeton's] ultimate net loss in each occurrence in excess of $1,000,000 but [Princeton's] liability shall not exceed $1,500,000 in each occurrence."

Article V, the portion of the Treaty dealing with warranties, stated that, "[Princeton] warrants that the maximum Employers' Liability limits are as follows, or so deemed: i. Bodily Injury by Accident—$100,000 each accident...." According to the District Court, the warranty section

did not alter the basic analysis under which Converium was liable for up to $1.5 million for claims paid by Princeton in excess of $1 million. Although Converium's liability was "subject to ... [the] warranties of ARTICLE V," this meant only that Princeton pledged that it would issue EL insurance subject to the limits described in the warranties. In the District Court's view, Princeton complied with the warranties, offering a policy to 1st Choice Metal with EL coverage limited (on its face) to $100,000. If the parties had intended to limit Converium's EL liability to $500,000 per incident, they would have done so explicitly in the section that contained the other limitations on Converium's liability, not in the warranty section. To construe the warranty section as imposing a limitation on coverage would require denying the common understanding of the word "warranty." Therefore, the District Court held, the contract unambiguously does not limit EL coverage, and Converium was liable for the full $1.5 million in coverage, plus interest.

The problem with the District Court's analysis is that it fails to account for the phrase "or so deemed" in the warranty section. The warranty provision in question states, "[Princeton] warrants that the maximum Employers Liability limits are as follows, *or so deemed:* i. Bodily Injury by Accident—$100,000 each accident ...." (emphasis added).[1] We follow the parties usage and use the somewhat inelegant term "Deemer Clause," to refer to this phrase. Converium proposes that the Deemer Clause, which was included in the Treaty at Converium's insistence, means that, if Princeton fails to include an enforceable limit on liability pursuant to the Treaty, the limit will nevertheless be deemed to have been included, and the

---

1. As we previously noted, this limit was subsequently raised to $500,000.

policy will be covered under the Treaty as if the limits were in place.

Princeton advocates a slightly different interpretation. According to Princeton, the Deemer Clause comes into effect only if Princeton issues an insurance policy with no stated limits on EL coverage. In such a case, the policy is covered under the Treaty as if it included warranty limits, just as Converium suggests. Princeton does not believe the Deemer Clause is implicated in the current case, however, where the insurance policy at issue complies on its face with the warranty requirement. The 1st Choice Metal policy did include a limit on EL coverage—it just so happened that the limit was unenforceable.

On either understanding of the Deemer Clause, the warranty provision cannot be interpreted as the District Court saw it, solely as a promise or guarantee. In a typical warranty, the warrantor agrees to fulfill a promise, and any failure to comply with the promise would represent a breach of the contract. *See* BLACK'S LAW DICTIONARY 1725 (9th ed.2009) (defining "warranty" as a type of promise or representation whose breach will not be lightly excused: "a warranty is conclusively presumed to be material ... and ... must be strictly complied with"). Under either proposed interpretation of the Deemer Clause, the warranty in the Treaty functions differently. The consequence of Princeton's failure to comply with the warranty is that, at least in some circumstances, Princeton is deemed to have complied. Effectively, the Deemer Clause redefines the EL limits in Princeton's policies in a way that limits Converium's liability under the Treaty.

The District Court, by viewing the warranty provision solely as a traditional warranty, effectively rendered the Deemer Clause meaningless. The principle that, in interpreting a contract, " 'all parts of the writing and every word of it, will, if possible, be given effect,' " *Krosnowski v. Kros-*nowski, 22 N.J. 376, 126 A.2d 182, 188 (1956) (quoting 9 WILLISTON ON CONTRACTS § 46 (rev. ed.1945)); *accord Cumberland County Improvement Auth. v. GSP Recycling Co.,* 358 N.J.Super. 484, 818 A.2d 431, 438 (N.J.Super.Ct.App.Div.2003), is especially relevant here, where Converium insisted that the Deemer Clause be inserted into the Treaty that Princeton's agent had drafted. The District Court erred in concluding that the warranty clause, because of its label as a warranty, unambiguously did not limit Converium's liability under the contract.

### C.

If the warranty section placed some limitation on Converium's liability to Princeton, the question remains whether the meaning of the limitation is unambiguously defined in the Treaty. If so, the case can be decided at the summary judgment stage; otherwise, we must remand it for trial. *See Pennbarr Corp. v. Ins. Co. of N. Am.,* 976 F.2d 145, 149–50 (3d Cir.1992); *Bedrock Founds.,* 155 A.2d at 541. Each party contends that its interpretation is the only reasonable one, and that summary judgment should be granted to it.

The strongest argument for Converium's position is common sense. It would be strange for the parties to have meant to exclude New York policies from a limitation on EL coverage that applied to every other state in which Princeton wrote insurance policies. Both parties understood that the Treaty limited EL coverage to $500,000, and they presumably priced the coverage accordingly. If Princeton were able to escape the limitations of the Treaty by writing an insurance policy that conformed with the Treaty warranties in form but not in substance, the parties' intentions at the time of signing the contract would be defeated.

To bolster its argument, Converium turns to evidence of internal communications in which Princeton employees seem to have acknowledged that a $500,000 limit would apply. Converium calls these conversations "contemporaneous" with the contract, but in fact, the earliest cited communication came from 2002, seven years after the Treaty was signed and four years after it was amended to include New York. Only slightly more helpful for Converium is deposition testimony from Paul Curtis, the drafter of the Treaty on behalf of Princeton's agent, First Re. Curtis testified that he understood the warranty provision as establishing a limit on coverage. This testimony is far from conclusive, however, because it was not given until 12 years after the Treaty was drafted, and Curtis understandably does not appear to have remembered the details of drafting the Treaty. Converium further contends that the court should adopt its interpretation because the Treaty was drafted by Princeton's agent, and contracts should be interpreted strictly against the drafter. *See City of Orange Twp. v. Empire Mortgage Servs., Inc.*, 341 N.J.Super. 216, 775 A.2d 174, 181 (N.J.Super.Ct.App.Div.2001). But this argument is undercut by the fact that the Deemer Clause itself was inserted into the contract at Converium's insistence.

Princeton's position depends primarily on the structure of the contract. If the parties intended to place a blanket limit on Converium's EL liability, one might have expected them to include an explicit limit in the portion of the Treaty dealing with liability limits, rather than to create an oblique limit in the warranty section. It is plausible that a contract would be structured to require Princeton to do its best to establish a limit on its EL liability, but to assign to Converium the risk that a good-faith attempt to establish a limit would be invalidated by operation of law. If the parties had intended to draw such a distinction, the structure of the Treaty would be a logical way to achieve this end.

To drive home the point that the Treaty does not directly state what Converium believes it does, Princeton produced several other Converium contracts that established limits on EL coverage more explicitly than the Treaty did. But the lack of parallelism between these other documents and the Treaty can be explained by the fact that Converium did not draft the Treaty. Furthermore, at least one of these Converium contracts defined the limitations on coverage in the warranty section, suggesting that the Treaty was not unusual in this regard.

The language of the Treaty thus admits of more than one interpretation, and extrinsic evidence does not provide much help. In short, the contract is ambiguous, and the District Court should not have granted summary judgment in favor of either party. *See Pennbarr*, 976 F.2d at 149–50.

## IV.

For the reasons discussed above, the judgment of the District Court will be vacated, and the case will be remanded for further proceedings consistent with this opinion. Each party shall bear its own costs on appeal.