

2008 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

5-28-2008

# Lawrence v. Philadelphia

Precedential or Non-Precedential: Precedential

Docket No. 06-4564

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2008

Recommended Citation

"Lawrence v. Philadelphia" (2008). *2008 Decisions.* Paper 1087.
http://digitalcommons.law.villanova.edu/thirdcircuit_2008/1087

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2008 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———

No. 06-4564

———

RICHARD LAWRENCE; KEVIN JACKSON; JOHN COLE;
SCOTT D. MCGARRIGLE; RICHARD MARKS; IVAN T.
DAMJANOVIC; MORGAN MILLER; ALAN SIGAL;
W. RUSSEL BRYANT; MERVIN K. GHANI; ALLEYNE
ARTURO; JONI H. KUONEN;
DOMENIC ROSATI; JOHN W. GETTY;
JOSEPH C. MANCINI; WILLIAM BRENT;
MICHAEL BROOKS; DUANE J. BOYES;
MICHAEL A. FLAK; J. TODD VREELAND;
ADAM WOJNICKI; TIMOTHY S. O'TOOLE;
CARL F. PFEFFERLE; BETH ANN GLYNN;
WILLIAM MURPHY; MATTHEW KONIECZKA; CORY
BULLOCK; WILFRED SPEAKES;
JOSEPH A. DECICCO; MEDLEN E. AREVALO;
STEPHEN M. SPECHT; SAMUAL S. CHEN; RASHAW
REED; CLEO BOND; CHRISTOPHER F. LAPPE;
AMADOR ROLON, II; CHRISTINA YATES;
COLLEEN CARLIN; RICARDO ORTIZ; JAMES H.
ATKINSON, III LUIGI ROSMINI;
BARRY ROSENBERG; HILDA L. CARTAGENA;
CHRISTOPHER BALDINI; BRIAN FINDLAY; JOHN J.
BECHT; US TRUSTEE FRED BAKER;
DAVID SCHWARTZMAN; MICHAEL WRIGHT;
PATRICK J. CAREY; AARON C. BOYD; LAWRENCE R.
BELITSKY; THOMAS J. DOUGHERTY, JR;
WILLIAM MAUDE; JOHN IUSHEWITZ; CHET ZAREMSKI;
STEPHEN EDWARDS; JOSEPH F. RYAN; AMANDA
KUKODA; STEPHEN MCCARTHY;
EDWARD J. LENDVAY; TERESA Y. HEIGHT;
RAECHEL ALEXANDER; DIANE M. PELLECCHIA;
KENRIC C. GARY; MARK E. LEHMANN;
PATRICK X. CROWLY;

MICHAEL J. SUTTON; TIM M. KING; JOHN OPONIK;
DONNA C. COLEMAN; JOHN B. SPENCER; RAYMOND
ANDERSON; DARREN P. MCLENDON;
JOSEPH V. GILMORE, JR.; ANNA T. RITTER;
NADINE MCFARLANE; COLLEEN M. SPECHT;
DANIEL RODRIGUEZ; PETER J. SPECOS. SR.; MATTHEW
CRANE; CHRISTOPHER M. RUSSELL;
ALAN ELHYANI; HAROLD A. COFER;
JEFFEREY M. DELLA PENNA;
VINCENT ORTIZ; CHRISTOPHER MCKEE;
RANDY J. WADDELL; LARRY D. CARROLL; MONIQUE
WILSON; STEPHEN GRAN; TIMOTHY O'NEIL; JOSEPH A.
VERICA, JR.; KEITH DAVIS;
SHONDA DAVIS; ANNE RAVEN; JOANNE PRZEWORSKI;
CHRISTIAN CAMPBELL; WAYNE A. CHISHOLM;
KINZLE E. EDWARDS; PAUL E. KLEIN; MAHNIA K.
MCMULLEN; NELSON MERCADO;
ALLEN NORTON; RAPHAEL JONES; TRACY JEFFERSON;
TANYA BROCKENBOROUGH; KHARY HUNT;
KIA DAVENPORT; BEVERLY ELUM; BRUCE R. SQUARE;
LAWRENCE AMAKER; PETER A. SAVARESE; RUSSELL J.
WELLS, JR.; APRIL SMALLWOOD;
DON ALSTON; LOUIS J. COLELLA, JR.;
KALE ETCHBERGER; ZACKARY M. RUNIONSI; MACK
ABDUL-LATEEF; BRIAN C. ACKERMAN; MARC E.
AMOROSE; KERMIT ANDERSON;
COLLEEN ANDREJCZAK; DEBORAH APONTE;
SCOTT M. BAHNER; JESSICA L. BIEDRZYCKI;
LAWRENCE O. BLOOMFIELD;
VINCENT R. BOLOGNONE; RICHARD T. BRADSHAW, JR;
OREN BROADWAY; DANIEL J. BROOKE; DONALD A.
BRYAN; KAREN BUCCA; ROY BURKETT; ROBIN A.
BURNS; BRIAN K. BYERS; JAMES BYRNE;
ESTATE OF MICHAEL L. BENNETT;
RYAN J. CALLAHAN; JOHN A. CANCELLIERE, JR.;
KEVIN F. CAREY; MANUEL CARTAGENA;
DAVID A. CISZKOWSKI; JERMAINE A. CLEVELAND;
ROBERT COLL; FRANCIS S. CONGDON;
JOSEPH A. CONNOR; KATHY L. CONNORS; JOANN M.
CONTI; MARK G. CREWS;

2

ERIC H. CROUCH; OLIVER H. DAVIES, JR.; CAROLYN DELORENZO; SHANNON M. DENNIS; LISA DICASTANDO; JOSEPH A. DICICCO; KATHERINE DICLEMENTI; DANIEL A. DOLPHIN, SR.; SHARON DONAHUE; MICHAEL P. DONAHUE; BRIAN J. DOUGHERTY; MARK J. DOYLE; BRIAN EVERAGE; RAYMOND S. FARLEY; MICHELE FERRERA; MATTHEW J. FLANAGAN; GREGORY M. FLOOD; CRAIG FRENCH; QUENTIN FULLER, JR.; PAUL L. GAC; JAMES G. GADEBUSCH; SHANE T. GAGHAN; ROBERT J. GALLAGHER; FRANCIS J. GALLAGHER, JR.; DAWN (LOESCH) GARROW; RAYMOND F. GEORGE, JR.; ANDREAS GEORGIADES; ROBERT L. GETZ, JR.; ROBERT D. GLASGOW; SAMUEL J. GOLLAPALLI; GREGORY R. GORDON; NICHOLAS GUIRATE; JOSEPH HAINES; FRANCIS P. HANNA; KATHERINE M. HANNAN; DAVIS HANSEN; OLIVIA HAVEN; WILLIAM HENDERSON; JOHN J. HOLSTEIN; JOHN IUSHEWITZ; BETH ANN JABLOSKI; JARED JACOBSON; DAWN JONES;  DAVID P. KEARNEY; JOSEPH J. KENNISH, III; GERARD KERSHW; PAUL KIRK; VERONICA M. LAKE; HOWARD M. LAUDER; CHRISTOPHER G. LENTZ; FREDERICK J. LICSAUER; JAMES A. MACMILLAN; RAUFAIL E. MALLARD; JAMES P. MARCOLONGO; PATRICK L. MCALLISTER; SHERRI MCALLISTER; MARTIN W. MCCALL; LISA I. MCCALL; STEVEN MCCLOSKEY; JAMES MCGUIRE, III; JOSEPHJ. MCKAY, JR; CHRISTINE MCKEE; TANJI MICHAEL; DAVIS MITCHELL; DAVID MITCHELL, JR; THERESA MOBERG; CHER MOORE; BENGIE D. MOORE; JEFF M. NEARY; THEODORE J. NULTY; THOMAS P. NYSZCZOTA; KERRY L. OANDASAN; COLLEEN O'DONNELL; DENIS REACOCK; JOSEPH PEMBROKE; TERRANCE PRICE; JOANNE PRZEWORSKI; MARK PUGH; MICHAEL QUATROCHI; ELVIN RODRIGUEZ; THOMAS J. RUSBY; JOSEPH RUSSELL; GERARD SCHRAMM; KARL SCHUJKO; JEFFREY A. SCHURR; ARTHUR W. SEEGER, III;

3

MICHAEL R. SHANKS; HENRY JAY SINGLETON, JR.;
IRAN D. SMITH; LISA SPONHEIMER;
MARK ST.MRIE; YOLANDA C. STALLINGS;
THERESA L. STRINGER; KIM W. TAIT; MATTHEW
TANKELEWICZ; JAMES TAYLOR;
COLLEEN TEEFY; PAUL TERSHA;
WILLIAM R. THORNTON; DAVID TIZOL; JOAN TOOHEY;
CHARLES TUTTLE; LAMONT WASHINGTON;
CRYSTAL YATES,

              Appellants

v.

THE CITY OF PHILADELPHIA, PENNSYLVANIA

———

No. 06-4576

———

DONALD H. ALSTON,

              Appellant

v.

THE CITY OF PHILADELPHIA, PENNSYLVANIA

———

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Nos. 03-cv-04009, 04-cv-02764)
District Judge: Honorable Clifford Scott Green

———

Argued October 25, 2007

Before: SLOVITER, CHAGARES, and HARDIMAN,
Circuit Judges

4

Robert A. Jones   (Argued)
Chamberlain, Kaufman & Jones
Albany, NY 12205

      Attorney for Appellants

George A. Voegele, Jr.   (Argued)
Cozen & O'Connor
Philadelphia, PA l9l03

      Attorney for Appellee

Brian P. Walter
Liebert Cassidy Whitmore
Los Angeles, CA 90045

      Attorney for Amici-Appellees League of California
      Cities, International Municipal Lawyers Association,
      National League of Cities, National Association of
      Counties, National Public Employer Labor Relations
      Association and the International Public Management
      Association for Human Resources

_____

OPINION OF THE COURT
_____

SLOVITER, <u>Circuit Judge</u>.

It is generally known that by law an employer must pay time-and-a-half for overtime.  It is less well-known that certain employment is exempt.  We must decide an issue of first impression in this circuit, that is whether paramedics employed by the City of Philadelphia Fire Department have "legal authority and responsibility" for fire suppression activities within the meaning of the Fair Labor Standards Act, thereby bringing

them among the exemptions.

# I.
# Background

Appellants are Fire Service Paramedics ("FSPs") employed by the City of Philadelphia Fire Department ("Fire Department"). In July 2003, Appellants filed suit in the District Court for the Eastern District of Pennsylvania, alleging that Appellee, the City of Philadelphia ("City"), had violated the overtime payment requirements of the Fair Labor Standards Act ("FLSA"), specifically 29 U.S.C. § 207(a) (requiring employer to pay overtime for any employee working more than forty hours in a workweek). Pursuant to a stipulation approved by the District Court on May 31, 2006, other FSPs with similar claims were permitted to "opt in" to the action. See 29 U.S.C. § 216(b) (permitting individuals to "opt-in" by filing a written consent with district court). There are now approximately 300 named plaintiffs.

In the District Court, neither party sought a jury trial. Instead, the parties filed cross-motions for summary judgment. Both parties agreed at summary judgment that there were no material facts in dispute, leading the District Court to conclude that the case was appropriate for summary judgment. The parties take the same position on appeal.

On September 29, 2006, the District Court entered summary judgment in favor of the City and against the FSPs, thereby determining the issue of liability. Lawrence v. City of Philadelphia, No. 03-cv-4009, 2006 WL 2847330 (E.D. Pa. 2006). The FSPs appeal, arguing that the District Court erred in determining that they were trained in and had responsibility to engage in fire suppression activities as required by 29 U.S.C. § 203(y).

A.    Overview of FLSA Framework

The FLSA states that, unless otherwise provided in the FLSA, an employer may not allow its employee to work for

more than forty hours in a workweek unless the employer pays the employee "time-and-a-half" for the hours spent working over forty hours. 29 U.S.C. § 207(a). Section 207(k) exempts a "public agency" from subsection (a)'s overtime requirements with respect to various categories of employees, including individuals engaged in "fire protection activities."[1] Section 203(y) defines what it means to be engaged in "fire protection activities." There are three statutory requirements that an individual must meet in order to be engaged in fire protection activities. The individual: (1) must be "trained in fire suppression;" (2) must have "legal authority and responsibility to engage in fire suppression;" and (3) must be "employed by a fire department." 29 U.S.C. § 203(y). The parties agree that the third requirement has been met and is not at issue. They focus on the other two requirements, primarily whether FSPs are trained in fire suppression and have legal authority and responsibility to engage in fire suppression within the meaning of the exemption to the FLSA. If so, the exemption applies, and the City can pay a lower rate of overtime. If the City has not shown that both requirements are met, the exemption does not apply, and the City must comply with the higher overtime rate.

B.    History of the FSP Program

       The Fire Department employs firefighters that are assigned to about sixty engine and twenty-nine ladder companies in over sixty firehouses throughout the city. The City also employs about 300 FSPs, assigned to forty different medic units, which are located in firehouses.

       In the early 1970s, the Fire Commissioner decided that the Fire Department had developed the need for individuals with

---

[1] Other exemptions cover individuals engaged in "law enforcement activities," including individuals employed as security personnel in correctional institutions. 29 U.S.C. § 207(k). There are also exemptions for other professions, such as, inter alia, hospital employees, id. § 207(j), retail or service employees, id. § 207(i), and public transportation employees, id. § 207(a).

7

paramedic skills to become part of the Fire Department's emergency response team. Because firefighters had some experience with first aid, the Commissioner decided that certain firefighters would be converted into fully trained and certified paramedics. The first group of those "cross-over" individuals went into service in 1973. In 1980, the City created a specific job classification for "fire paramedics," indicating that those individuals were fully trained both as firefighters and paramedics; the City even offered a ten percent pay increase to "fire paramedics" in order to aid recruitment efforts. App. at 2086.

Throughout the 1980s, the cost of sending firefighters to paramedic school (a one-year program) continued to increase, and as a result, in 1988 the City began hiring individuals already trained as paramedics for the position of "fire paramedic." The City then sent those individuals to the City's Fire Academy for instruction in fire suppression, hazardous-materials response training, and the City's emergency protocols and procedures. Those paramedics were designated "fire service paramedics." Beginning in 1989, most of the FSPs recruited were trained and certified paramedics from outside the Fire Department who were then instructed at the Fire Academy with respect to the Fire Department's practices and protocols.[2]

Today, although firefighters and FSPs work for the Fire Department, they are distinct positions. Paramedic training takes about one year, whereas firefighter training takes sixteen weeks. Paramedics receive higher pay than firefighters generally, and if a paramedic wanted to switch jobs and become a firefighter, s/he would be considered to be "demot[ing] down." App. at 1241. At the conclusion of their training, firefighters receive a certificate designating them in the class "Firefighter I;" FSPs do not receive such a certificate, but rather receive a certificate for

---

[2] For purposes of collective bargaining, FSPs are represented by the same union as firefighters, the International Association of Firefighters, Local 22. We note that the union has not taken a position in this case.

"Fire Service Paramedic Orientation" in addition to the paramedic certification they are required to obtain before joining the Fire Department.

The collective bargaining agreement provides that FSPs work according to rotating eight-day shifts, known as "platoon schedules." A platoon schedule consists of either: (1) two ten-hour shifts followed by two fourteen-hour shifts, followed by four days off (called A, B, C, or D platoon), or (2) four twelve-hour shifts followed by four days off (called E or F platoon). An employee may work as little as thirty-four hours or as many as forty-eight hours in a typical work week. FSPs receive pay for forty-two hours of work each two-week pay period, whether they worked thirty-four hours or forty-eight hours. For the forty-first and forty-second hour of each pay period, FSPs are paid at a higher rate than for the first forty hours but lower than time-and-a-half. FSPs receive "overtime pay" only if they work an extra shift, or work fifteen minutes or more longer than their assigned shift. It is therefore undisputed that in certain weeks, Appellants work more than forty hours but do not receive "time-and-a-half" pay for that time.

C.      Facts Regarding FSP Authority and Responsibility for
        Fire Suppression Activities

1.      Job Duties and Mission of FSPs

In addition to the mission of the Fire Department, which as set forth in its Annual Report is "to deliver efficient and effective fire protection for the purpose of minimizing the loss of life and property," and which includes "fire abatement and extinguishment;" "comprehensive fire prevention programs conducted throughout the community;" and "fire investigation services to determine the origin and cause of fires," App. at 97, the Mission Statement states that the Philadelphia Fire Department is "also charged with delivering high quality, pre-hospital emergency medical care and transportation in a timely and professional manner. That is accomplished by providing EMS personnel with up-to-date training in emergency medical services and utilizing state-of-the-art equipment." App. at 97

9

(emphasis added).[3] The job description for an FSP states that the position involves "advanced life support and field paramedical work responding to emergency calls from the public to perform medical assistance with emphasis on the stabilization of patients to permit safe transport to a full-service medical facility." App. at 17 (emphasis added). We note that neither the Mission Statement nor the job description refers to any role with respect to fire protection or fire suppression.

The job description sets forth typical examples of work to be performed by FSPs, their required skills, knowledge and abilities, and their minimum acceptable training and experience. Every substantive aspect of the job description is medical in nature. For example, the job description states that an FSP must be able to observe patients' vital signs, clean wounds, treat burns, administer drugs, and prepare reports on each treatment given. The job description does not mention any fire protection related examples of work to be performed, or fire suppression skills needed to perform the job of an FSP, except that it does state that FSPs should receive orientation in the use of fire

---

[3] It appears that the category of EMS personnel encompasses, but is not co-extensive with, the FSP personnel. According to the Annual Report in the record, the 2001 activities of the Philadelphia Regional Office of the Emergency Medical Services listed "Direct and coordinate the education, training, evaluation, monitoring, testing, certification, continuing education, re-certification and reciprocity of 2,933 Emergency Medical Technicians, 1,226 Paramedics" and others. App. at 109. This suggests a distinction between EMTs and FSPs, as does the discussion of EMS Training which stated that "EMS training covers a myriad of topics to give Paramedics and Emergency Medical Technicians the knowledge and skills needed to deliver high quality, pre-hospital care." App. at 108. The argument of this appeal did not focus on the relationship between EMTs and FSPs (except for the First Responders, to be discussed hereafter), and it does not appear to be relevant to our disposition. If deemed relevant on remand, the District Court can make the appropriate inquiry.

10

equipment "as applicable to paramedical work." App. at 17-19 (emphasis added).

FSPs are dispatched to provide emergency medical services ("EMS") to individuals for all kinds of problems, not only in response to fires. Philadelphians suffering heart attacks, strokes, or broken bones who call 911 are referred to the Fire Department. In fact, FSP dispatches to fire scenes account for only about one tenth of one percent (i.e., .1%) of FSP ambulance dispatches in a year, that is, for some appellants, only five to ten times per year, contrasted with 6,000-8,000 total EMS dispatches.[4] When a fire is reported, a paramedic unit is not always dispatched to the scene; rather, the Fire Communications Center determines whether a paramedic unit is necessary and sends one only if necessary.

According to a Fire Department directive for FSPs, a principal purpose of the EMS personnel is to establish a first aid station and provide first aid. The directive specifically states that the FSP should be "standing by" and ready to provide first aid assistance as necessary. App. at 29. The FSPs are supposed to park their paramedic vehicles in a location that will provide a means of quick egress from the fire scene, i.e., at least two blocks away. The directive does not say anything about fire suppression duties of FSPs.

The City emphasizes the declaration of former Fire Commissioner Harold Hairston that FSPs are trained in fire suppression so that they "can provide fire suppression if called upon to do so by their incident commander or by other circumstances." App. at 2100-01. He said it was his policy to authorize FSPs "to engage in fire suppression activities when called upon by an Incident Commander or in any other circumstance that required them to take such action." App. at 2101. Fire Commissioner Lloyd Ayers stated the same in his

---

[4] The activities of the FSPs are at issue here, not those of fire departments nationally to which the dissent refers. Dis. Op. at n.7.

11

declaration. In addition, during the first week of their training program, FSPs receive the FSP Code of Conduct, which they are required to sign in order to graduate from the Fire Academy. The Code states, in relevant part, that the cadet "recognize[s] [his or her] responsibility to render Fire Suppression . . . ." App. at 2166. However, at oral argument, the City could cite no instance in which an FSP was called upon to enter a burning building to put out a fire, or was expected to perform any fire suppression duty other than a few marginal instances involving nothing more than moving a hose line.

The Fire Department evaluates FSPs and firefighters based upon the same criteria, and uses the same form for both. There are nine criteria listed on the form, including Teamwork, Dependability, Knowledge, Quality of Fire Duty, and Participation in Fire Prevention Activities. With respect to "Quality of Fire Duty," the form instructs the evaluator to rate the FSP's "[a]bility as a firefighter: effort to do a good job at fires or places of emergency without persuasion." App. at 2268. The "Participation in Fire Prevention Activities" criterion rates "[i]nterest and enthusiasm in fire prevention activities, originality of ideas, [and] amount of participation." App. at 2268. Some of the FSP evaluations make specific reference to an FSP's performance on firegrounds. For example, plaintiff Michael Brooks' evaluation states that his performance on the fireground is commendable, although the evaluation does not state that Brooks performed fire suppression duties. Another evaluation, that of plaintiff Duane Boyes, states that Boyes' enthusiasm on the fireground is exemplary. We note that the use of the term fireground does not imply fire suppression activities, because the FSPs are, on certain occasions, called upon to provide paramedic services on a fireground.

The FSPs spend most of their time, however, "responding to emergency calls from the public to perform medical assistance," with particular emphasis on stabilizing patients so that they can be safely transported to a full-service medical facility. App. at 17. Those medical calls in 2004 comprised approximately 5,990 of the 6,000 calls received by FSPs and were entirely medical in nature.

12

2.    Fire Suppression Activities

The parties do not agree whether FSPs ever engage in certain fire suppression activities.  On occasion, a superior officer may instruct an FSP to assist with a hose line.   For example, FSP Boyes testified that a chief directed him to help "stretch hose line" at the fireground.  App. at 1438.  FSP William Brent, another plaintiff, testified that on one occasion he used the fire extinguisher located in his ambulance to try to put out a vehicle fire when he arrived on the scene before a fire engine had arrived.  FSP Brooks stated that he has pulled a fire hose off of a fire truck to assist the firefighters, and has hooked a hose up to a hydrant, but that he never carried a hose into the fire scene itself.  Several other FSPs testified that they had moved hose line or carried it for short distances if the hose was blocking traffic or impeding access to the fire site.

Thomas Comerford, a retired Fire Department Battalion Chief (a middle management safety officer), testified at his deposition that in forty-four years working for the Fire Department, he never saw an FSP "handling" a fire hose, meaning using a hose in active firefighting.  On occasion he saw an FSP help out by taking kinks out of hose, but the FSP was still standing by waiting to perform medical duties should they arise.   Comerford stated that he, as an on-site manager, "wouldn't let [FSPs] anywhere near a fire building," App. at 1256, because it is unsafe and more importantly, unsanitary, because the FSP's duty is to provide medical care.  Comerford testified that he "reprimanded a paramedic for going into a burning building to try to save . . . a kid." App. at 1256.  He told the paramedic that if he wanted to be a firefighter, he should "take the cut in pay and transfer over," and the paramedic did so. App. at 1257.  According to Comerford, paramedics who try to be firefighters are a problem, not part of the solution.

The City contends that there is no record evidence of any formal reprimand of FSPs for performing fire suppression duties. The City points to former Human Resource Manager Ronald Augustyn's declaration stating that to the best of his knowledge "no fire service paramedic has been disciplined for engaging in

13

fire suppression activities while [he] served as Human Resources Manager." App. at 2090; see also App. at 2102 (Hairston Declaration) (stating that in twelve years as Fire Commissioner he never knew an FSP to be disciplined for engaging in fire suppression activities).

FSP Boyes testified that his understanding of the City's policy regarding FSPs fighting fires was, "[t]hat's not our responsibility. That's what firefighters are for. We're there for first aid." App. at 1457. He also testified that if any officer ordered an FSP to assist with fire suppression efforts, the officer would have been disciplined if caught. Kevin Carey, an FSP lieutenant, declared that he was told by Chief George Griffin in April 2004 that FSPs were prohibited from fighting fires and that they would be disciplined if caught doing so.

There is evidence, by way of declaration by at least eleven FSPs, that they have not entered burning buildings, have not handled a fire hose to fight a fire on a fireground, and have not controlled a nozzle on a firehose on a fireground. With one exception, FSPs have not been ordered by superior fire officials to use a hose to fight fire or to engage in other fire suppression activities, and they generally have not done so. The one exception was when a fire officer ordered a paramedic to "help out with a hose line" to move the hose over a fence. App. at 1438.

There have been some incidents of FSPs voluntarily helping a firefighter at a fire scene, e.g., by helping to move a hose while the FSP is standing by waiting to give medical care. This type of voluntary assistance is known as "freelancing." It is unclear whether "freelancing" is prohibited by the Fire Department. There is some evidence that freelancing was against the standing rules of the Department and was not condoned. There is also evidence that a person caught freelancing could be disciplined, and that if an officer allowed FSPs to freelance, the officer could in turn, be disciplined by his superior officers.

Occasionally, FSPs must engage in limited fire suppression activities in the course of their paramedic

14

responsibilities.  For example, two plaintiffs (Manuel Cartagena and Paul Klein) were dispatched to a home because a woman was complaining of stomach pains.  When they arrived, the FSPs entered the home to care for the woman, and while inside realized that there was a fire in the house.  One FSP removed the woman, and the other attempted to use his small fire extinguisher to tend to the fire until the firefighters could arrive.  Cartagena and Klein received a citation for their efforts.

3.      Fire Prevention Activities

In its argument, the City points to fire prevention activities conducted by FSPs.  Plaintiff Donald Alston testified that at least forty times in his career as a paramedic, he reported back to his supervisors when he observed fire hazards at locations where he had performed a medical run.  Another FSP testified that if he saw a broken smoke alarm in a home while performing a medical run, he would notify the occupant or report to the supervisor.

4.      Equipment Used by FSPs – Fire Extinguisher, SCBA, Bunker Gear

The City also attempts to support the summary judgment by pointing to the equipment used by FSPs.  Unlike firefighters, whose first mission is to extinguish fires, FSPs are assigned to ambulances, not fire trucks.  A fire truck must be attended by firefighters.  The paramedic ambulances used by FSPs are not equipped for firefighting (i.e., they have no water, no hoses and ladders, no capability to pump water).  Each ambulance contains a small fire extinguisher, which is required in any vehicle that transports oxygen.  Each ambulance also has a Self Contained Breathing Apparatus ("SCBA").  Commissioner Hairston, whose declaration was introduced by the City, stated that the purpose of installing the SCBA was to enable FSPs to render fire suppression when necessary.  However, there is evidence that the purpose of installing SCBA in ambulances was to give paramedics an air supply in case they were dispatched to a chemical spill or other hazardous environment.

15

FSPs are issued "bunker gear" or "turnout gear," which is protective clothing for use in hazardous conditions. The bunker gear includes a helmet, bunker coat, bunker pants, pair of boots, two pairs of gloves, mask, and suspenders. FSPs are issued blue helmets, whereas firefighters are issued yellow helmets. According to a Fire Department directive, all personnel, including FSPs, are required to wear bunker gear at a fireground unless otherwise directed by a superior officer.

5.      First Responder Companies

FSPs must be distinguished from the members of the City's ninety "First Responder Companies," staffed by firefighters trained and certified as emergency medical technicians. The First Responders are assigned to fire engines, and they are used when there is a medical emergency for which a paramedic ambulance is not available.

D.      Facts Regarding FSP Training

Although the FSPs receive training, the training differs from that given to firefighters. The FSP orientation program, which, like that for firefighters, occurs at the Philadelphia Fire Academy, began in March 1989. Between 1989 and the present, the training program has ranged from four to seven weeks; it is currently about seven weeks. The first week involves basic administrative material. Two or three weeks are devoted to fire suppression instruction, described by the FSP Cadet Guidebook as "basic-level instruction in some of the fundamentals of firefighting, hazardous materials incidents, safe operating procedures, driver training and departmental procedures." App. at 896. Finally, three or four weeks involve EMS training. The FSP training program textbook is the "Brady Manual" for paramedics. App. at 1888. The FSPs are not required to purchase the "Essentials of Firefighting" textbook, which is the text for the firefighting training program, although there may be times when FSPs receive handouts of excerpts from "Essentials of Firefighting." Upon completion of the seven-week program, FSPs receive a certificate for "Fire Service Paramedic Orientation," not a certificate for completing the "Basic Course

16

for Firefighter."

According to the Cadet Guide Booklet for the 22nd FSP paramedic class, there are nine "skills evolutions," or job standards, that the FSPs must meet in order to graduate from the Fire Academy. There is evidence that those skills evolutions have been used consistently since at least 1999. The stated program goal of the FSP training program, as articulated in the "Philadelphia Fire Department Skills Proficiency Standards for Fire Service Paramedic Cadets," is "[t]o develop the necessary physical and practical skills a FSP cadet needs to be able to perform to become an effective paramedic." App. at 693 (emphasis added). Evolutions #1-#5 require the FSP to demonstrate proficiency in tasks involving transporting medical equipment, carrying patients, and using a stretcher. Evolutions #6-#8 require the cadets to demonstrate proficiency in raising and climbing ladders. Evolution #9 requires the cadets to "demonstrate calmness" while rescuing a victim in an area with little visibility, requiring the use of SCBA. App. at 695.

Appellants contend that only the first five evolutions are mandatory and cite to portions of memoranda referencing the "five (5) components of the required Skills Proficiency Testing." App. at 745. Appellants also argue that evolutions #6-#9 do not test proficiency and do not involve fire suppression. The City counters that all nine evolutions are mandatory and that evolutions #6-#9 do involve fire suppression.

The purpose of the instruction in the two or three weeks devoted to fire suppression, is "to familiarize [the FSPs] with the operations of the people that they are going to be working with in the engines and the ladders, and also it's familiarization training for [the FSPs] when they have to utilize certain firefighting equipment." App. at 1883. Fireground orientation also teaches FSPs how to provide medical care safely on a fireground. The program includes lecture and practical components.

The fire suppression classes are taught by firefighter lieutenants but the instruction that FSPs receive in fire

17

suppression would not qualify them to be firefighters; rather, it is meant to be an orientation to fire suppression. In a 1996 Memorandum, Gary Appleby, the Deputy Chief of the Fire Academy, explained the purpose of fire suppression training for FSP cadets as follows: "Although the majority of the time . . . FSP's will be engaged in 'standard' emergency service/pre-hospital care, there are numerous occasions in which the FSP's must operate in a structure fire, building collapse, hazardous materials release, etc. Based on these events, Fire Academy training must prepare the fire service paramedics to meet many of the identical challenges that Philadelphia Firefighters meet on a regular basis." App. at 2536.

Some FSPs viewed fire-related videotapes as part of their instruction. The videos, such as the "42nd Street Collapse" and "E. 29st Street Collapse," show the roles of both FSPs and firefighters at a fireground. App. at 2456. They also watched videos on the chemistry of fire, flashover, defense against fire, and other similar subjects. The parties disagree about the purpose of the videos. The City contends that the purpose is to train FSPs in fire-related topics and show them the different ways they might be called upon in a fireground situation. Appellants contend that the purpose of the videotapes was to instruct FSPs about their duties, specifically on how to stand by at a scene waiting to treat an injured person while the firefighters fought fires. In other words, according to Appellants, the purpose of the videos was not to train FSPs about fire suppression, but to train them on their medical duties in the context of a fire scene. The FSPs must take and pass a written "Final Fire Examination"after their training in fire suppression in order to graduate from the Fire Academy. FSPs must also attend in-service training.

As is evident from the foregoing summary of the facts in the record, both parties have cited certain instances that tend to contradict the general weight of the evidence put forward by the other party. That is not unusual in a large case involving approximately three hundred plaintiffs. The real issue is whether, looking at the evidence as a whole, there are any genuine issues of material fact with respect to the substance of the claims.

18

## II.
## Standard of Review

This court reviews the District Court's decision on summary judgment de novo. Blair v. Scott Specialty Gases, 283 F.3d 595, 602-03 (3d Cir. 2002). It is well established that the court must view all evidence and draw all inferences in the light most favorable to the non-moving party, Davis v. Mountaire Farms, Inc., 453 F.3d 554, 556 (3d Cir. 2006), and may affirm a grant of summary judgment only if no reasonable juror could find for the non-movant, Matsushita Elec. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). Summary judgment is appropriate only if there are no genuine issues of material fact. Davis, 453 F.3d at 556.

The rule is no different where there are cross-motions for summary judgment. In Rains v. Cascade Indus., Inc., 402 F.2d 241, 245 (3d Cir. 1968), this court stated, "[c]ross-motions are no more than a claim by each side that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waives judicial consideration and determination whether genuine issues of material fact exist."

There are additional considerations in an FLSA case because the FLSA must be construed liberally in favor of employees. See Tony & Susan Alamo Found. v. Sec'y of Labor, 471 U.S. 290, 296 (1985) (stating that the FLSA should be construed to the fullest extent of its intended purpose); Barrentine v. Arkansas-Best Freight Sys., Inc., 450 U.S. 728, 739 (1981) (explaining that the purpose of the FLSA is to protect workers from substandard wages and oppressive working hours).

FLSA exemptions should be construed narrowly, that is, against the employer. Arnold v. Ben Kanowsky, Inc., 361 U.S. 388, 392 (1960) (emphasizing limited application to be given an exemption from the FLSA provisions). Specifically, an employer seeking to apply an exemption to the FLSA must prove that the employee and/or employer comes "plainly and

19

unmistakably" within the exemption's terms.  <u>Id.</u> (emphasis added); <u>accord</u> <u>Corning Glass Works v. Brennan</u>, 417 U.S. 188, 196-97 (1974) (holding that an employer has the burden of proof to show that it falls within the stated exemption).

### III.
### Discussion

We turn to examine in more detail whether the City has carried its burden to prove that there are no material disputed facts as to whether FSPs have legal authority and are responsible for fire suppression activities, as well as whether they are trained in fire suppression.  Both requirements must be satisfied before the City may decline to pay FSPs the required overtime.  As we noted earlier, if either requirement has not been satisfied, the FSPs are not exempted.

A.      Legal Framework

1.      Statutory Text

Under the FLSA overtime provision:

Except as otherwise provided in this section, no employer shall employ any of his employees . . . for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed.

29 U.S.C. § 207(a)(1).

The City argues that the FSPs are exempt from the overtime provision because they are employees engaged "in fire protection activities," <u>id.</u> § 207(k) which, by statutory definition, includes "an employee, including a firefighter, paramedic, emergency medical technician,  rescue worker, ambulance personnel, or hazardous materials worker," who –

(1) is trained in fire suppression, has the legal

20

authority and responsibility to engage in fire suppression, and is employed by a fire department of a municipality . . . ; and

(2) is engaged in the prevention, control, and extinguishment of fires or response to emergency situations where life, property, or the environment is at risk.

Id. § 203(y). Appellants do not dispute that they fall within the second prong of the exemption, that is, that they respond to emergency situations where life is at risk. As we previously noted, Appellants also do not dispute that they are paramedics and are employed by a fire department of a municipality. Thus, the only disputed issues are whether Appellants are: (a) trained in fire suppression, and (b) have the legal authority and responsibility to engage in fire suppression, as required by the first prong of § 203(y)(1).

2.     Legislative History

Prior to 1999, § 203(y) of the FLSA did not exist. Rather, two Department of Labor ("DOL") regulations attempted to interpret the meaning of "fire protection activities." First, 29 C.F.R. § 553.210 set forth a four-prong test for determining what constituted a fire protection activity. A separate regulation, 29 C.F.R. § 553.212, provided additional guidance, stating that even if an employee fell within the definition of fire protection activities in § 553.210, s/he might nonetheless fall outside the scope of the exemption if his/her duties in non-fire related activities took up more than twenty percent of his/her time. It appears that the purpose of that section was to account for those individuals who performed both firefighting and paramedic or other duties who might technically fall within the definition of fire protection activities in § 553.210 but who actually spent most of their time in nonexempt/non-fire activities.

In 1999, Congress added § 203(y) to the FLSA for the stated purpose to "clarify the overtime exemption for employees engaged in fire protection activities." Fair Labor Standards Act

21

– Amendment, Pub. L. No. 106-151, 113 Stat. 1731 (1999). See also Vela v. City of Houston, 276 F.3d 659, 673-74 (5th Cir. 2001) (discussing the legislative history of § 203(y)). In the congressional debates accompanying enactment of § 203(y), Representative Boehner observed that "there [was] a real need to modernize . . . the Fair Labor Standards Act and to clearly specify who can be considered a fire protection employee for purposes of the exemption," because several lawsuits had resulted in local governments being liable for substantial back pay due to courts' narrow interpretations of the § 207(k) exemption. 145 Cong. Rec. 28, 520 (1999) (statement of Rep. Boehner). Representative Boehner noted that in the past, EMS personnel had fit within the § 207(k) exemption because they received training, worked schedules and maintained levels of preparedness similar to that of firefighters. Id. More recently, however, courts had held that "[EMS] personnel [did] not come within the exemption because the bulk of their time [was] spent engaged in nonfire protection activities." Id. The sponsor of the amendment, Representative Ehrlich, stated that § 203(y) "seeks to clarify the definition of a fire protection employee," which had been rendered unclear due to recent inconsistent court interpretations. Id. at 28,521.

Prior to the enactment of § 203(y), the DOL regulations had specified that emergency medical services personnel might be eligible for the firefighter exemption "if they perform duties that are an integral part of the agency's fire protection activities," but an EMS employee would not be eligible if the employee spent more than twenty percent of his/her total hours worked on activities unrelated to fire protection. Id. at 28,520 (statement of Rep. Boehner). The purpose of adding § 203(y), therefore, was to "ensure that firefighters who are cross-trained as emergency medical technicians, HAZMAT responders and search and rescue specialists would be covered by the exemption even though they may not spend all of their time performing activities directly related to fire protection." Id. (statement of Rep. Boehner).

According to the congressional discussion, "[u]nder the 1985 amendments to the Fair Labor Standards Act, the [§

22

207(k)] exemption was intended to apply to all firefighters who perform normal firefighting duties. [The amendment] provides that where firefighters are cross-trained and are expected to perform both firefighting and emergency medical services, they will be treated as firefighters for the purpose of overtime. However, where emergency medical technicians are not cross-trained as firefighters, they will remain outside the purview of [§ 207(k)]and will be entitled to overtime after 40 hours a week, even if the emergency medical services are placed within the fire department." Id. (statement of Rep. Clay).

Thus, § 203(y) was intended "to reflect[] the range of lifesaving activities engaged in by today's fire service, built upon its long tradition of responding to all in need of help. Specifically, today's firefighter, in addition to fire suppression, may also be expected to respond to medical emergencies, hazardous materials events, or even to possible incidents created by weapons of mass destruction." Id. at 28,521 (statement of Rep. Ehrlich). More specifically, § 203(y) was intended to address the issue of "fire department paramedics trained to fight fires" who had recently prevailed in civil suits by successfully arguing that they were not fire protection employees because they spent more than twenty percent of their time responding to nonfire emergencies. Id. (statement of Rep. Ehrlich). By clarifying the § 207(k) exemption with the addition of § 203(y), Congress hoped to prevent the lack of clarity that had led to multiple lawsuits against local governments. The amendment was bi-partisan and uncontroversial; it was supported by labor and management. Id. at 28,520 (statement of Rep. Boehner).

3.      Judicial Interpretation

Three courts of appeals have considered the meaning of "responsibility" for fire suppression activities. In Cleveland v. City of Los Angeles, 420 F.3d 981, 983 (9th Cir. 2005), the court held that the fire protection exemption did not apply to 119 employees of the City of Los Angeles who were cross-trained as firefighters and paramedics. They were "fully trained and certified in both fire suppression skills and advanced life support paramedics." Id. (emphasis in original). They worked platoon

23

schedules similar to those worked by the FSPs in this case, and were assigned to work on paramedic ambulances. Id. at 984. The City also employed "single function" paramedics, who would sometimes be assigned to the same ambulance as a "dual function paramedic," but they performed the same work as the cross-trained "dual function paramedics" while assigned to that ambulance. Id.

The paramedic ambulances did not provide fire protection services (i.e., no hose, no water pumping, etc.), and the paramedic ambulances were not dispatched to every fire call but were dispatched only when needed. Id. When dispatched to a fire scene, the paramedics provided medical care. Id. If there was no further need for medical care, the incident commander had "discretion to release the paramedics from the scene . . . ." Id. In addition, dispatches to fire scenes comprised a very small amount of the paramedics' total yearly dispatches. Id.

The dual function paramedics were permitted to volunteer to assist firefighters but if they did not volunteer, they were not subjected to discipline. Id. There was no evidence that any plaintiff had "been ordered to perform fire suppression by an incident commander when assigned to a paramedic ambulance." Id. All personnel at the fire scene were "expected to wear fire protection gear," except the paramedics. Id. The paramedic ambulances were not equipped with fire suppression breathing equipment. Id.

The Ninth Circuit analyzed whether Los Angeles was bound to pay the paramedics time-and-a-half for overtime by considering both the DOL regulation at 29 C.F.R. § 553.210 and the recently enacted § 203(y). Id. at 989.[5] The DOL regulation

_____

[5] Section 203(y) of the FLSA was enacted three months after plaintiffs filed the complaint. Cleveland, 420 F.3d at 987. Rather than deciding the question whether § 203(y) applied retroactively, the court concluded that the relevant term being construed, which was included in both the regulation and § 203(y), would lead to the same conclusion. See id. at 988-91. Because the court declined to

24

defined an employee engaged in fire suppression activities as any employee who: (1) was employed by an organized fire department; (2) had been trained in fire protection; (3) had legal authority and responsibility to engage in the prevention, control, or extinguishment of a fire; and (4) performed activities that are required for and directly concerned with the prevention, control, or extinguishment of fires. 29 C.F.R. § 553.210(a). As discussed above, § 203(y) includes a nearly identical prong requiring that an exempt employee have "legal authority and responsibility to engage in fire suppression." 29 U.S.C. § 203(y)(1). The parties agreed that the case turned on whether the plaintiffs had "responsibility" to engage in fire prevention. Cleveland, 420 F.3d at 989. The parties did not dispute that the dual function paramedics were trained in fire protection.

The Ninth Circuit reasoned that to determine the meaning of a term in a federal regulation or statute, the starting point is the plain language of the text itself, i.e., "responsibility." Id. The court continued: "To determine the plain meaning of a term undefined by a statute, resort to a dictionary is permissible." Id. (citation and internal quotation marks omitted). The court considered three dictionary definitions of the term "responsibility" and noted that "responsible" means "expected or obliged to account (for something, to someone), answerable, accountable" and "involving accountability, obligation or duties." Id. (quoting Webster's New World Dictionary, Third College Edition (1986)). The court further noted that "responsible" means someone who has been delegated a duty by someone in authority and "who is subject to penalty in case of default." Id.

Applying those definitions, the court concluded that based upon the plain language of the statute, the City had not met its burden of showing that plaintiffs had the "responsibility" to engage in fire prevention, control, or extinguishment. Id. at 990.

consider the issue of retroactivity, it is not clear that the decision was properly decided under § 203(y). Nevertheless, the court clearly construed a portion of that statute.

25

The court reasoned that "for Plaintiffs to have the 'responsibility' to engage in fire suppression, they must have some real obligation or duty to do so. If a fire occurs, it must be their job to deal with it." Id.

The court cited the following six facts in support of its conclusion that the paramedics did not have the responsibility to engage in fire suppression: (1) the paramedic ambulances do not carry fire-fighting equipment or breathing apparatuses; (2) a dispatcher does not know if he or she is sending single or dual function paramedics to a call; (3) paramedic ambulances are not regularly dispatched to fire scenes and are dispatched only when there is a need for medical services; (4) dual function paramedics are not expected to wear fire protective gear; (5) dual function paramedics are dispatched to many different kinds of incidents, not just fires, to perform medical services; and (6) there was no evidence that a dual function paramedic was ever ordered to perform fire suppression. Id. The court did not say it intended those factors to be exhaustive.

Finally, the court noted that although Los Angeles argued that the legislative history of § 203(y) suggested that Congress' intent was to include dual function paramedics in the exemption, it was not appropriate to consider legislative history where the meaning of the statute could be gleaned from its plain language and common, ordinary usage. Id. at 990 n.11.

In McGavock v. City of Water Valley, 452 F.3d 423, 424 (5th Cir. 2006), which considered § 203(y), the plaintiff-appellees were five municipal firefighters employed by the City of Water Valley, Mississippi. The firefighters had graduated from the fire academy and were unquestionably trained in, and had legal responsibility and authority for, fire suppression activities. Id. They were actually called upon to extinguish fires on multiple occasions. Id. However, the firefighters also spent more than twenty percent (for some, as much as fifty percent) of their time engaged in dispatching duties, rather than actual fire protection activities. Id. at 424 & n.1. The firefighters sought overtime, claiming that they did not fall within the § 207(k) exemption. Id. at 424.

26

The Court of Appeals for the Fifth Circuit decided that § 203(y) supplants and replaces the previous regulations (29 C.F.R. §§ 553.210 and 553.212). Id. at 427-28. Under the court's interpretation of § 207(k), therefore, the twenty percent rule from § 553.212 would no longer apply. Id. at 428. The court held that under § 203(y)'s definition, the plaintiffs were engaged in fire protection activities, even though they spent more than twenty percent of their time doing non-exempt/non fire tasks. Id. at 427-28. Notably, in McGavock, the plaintiffs were fully trained firefighters who graduated from the fire academy and were trained in fire suppression. There was no dispute that they had the legal authority to engage in fire suppression and were actually called upon to do so. Id. at 424.

Following the argument on this appeal, an opinion of the Court of Appeals for the Eleventh Circuit considered the question whether a group of firefighter/paramedics employed by a county fire department was "partially exempt from the normal forty-hour overtime schedule established by the [FLSA]." Huff v. DeKalb County, --- F.3d ----, 2008 WL 398799 (11th Cir. Feb. 15, 2008). That court determined that the appellants were responsible for fire suppression and were therefore not entitled to additional overtime pay. Of course, that decision is not binding precedent on this court, but even if it were, it is distinguishable from the instant case.

In Huff, the plaintiff-appellants were fully cross-trained firefighter/paramedics employed by the DeKalb County Fire & Rescue Services, a fact the dissent overlooks in its emphatic statement that "I cannot accept the majority's claim that the 'great overarching distinction' between Huff and this case is that the Huff plaintiffs 'were without a doubt firefighters who also performed paramedic duties.'" Dis. Op. at 16. There was no dispute that all of the appellants "were fully trained and certified in both fire suppression skills and advanced life support." Id. at *1.

Some of the appellants were classified as "firefighter/paramedics" and some were classified as "fire medics." The firefighter/paramedics received National

27

Professional Qualification I ("NPQI") training, which is a higher level of training than that necessary to be a firefighter in Georgia.  Id.  Their job description stated that one of their duties was to perform basic firefighting.  The fire medics received NPQII training, which is certification in advanced firefighting (a higher level of training than NPQI).  Their job description stated that they had to operate apparatus to perform fire control and suppression, perform firefighting, and inspect fire hydrants and fire station equipment.  All plaintiffs were also responsible for providing emergency medical care.

Both the firefighter/paramedics and the fire medics could be assigned to fire apparatuses, including fire trucks, fire engines, and fire ladders.  Id. at *1.  Importantly, fire engines and other fire apparatuses could be staffed by two firefighter/paramedics or two fire medics, with no requirement that any other firefighter also be present.  All personnel were required to wear bunker gear at fire scenes, including air masks for breathing.  At a fire scene, the incident commander assigned job duties to all personnel; any personnel could be ordered to perform any job, including extinguishment of fire.  Anyone who failed to follow the orders of the incident commander would be subject to discipline.

In light of those facts, the Eleventh Circuit decided that the appellants were responsible for fire suppression activities.  The court based its decision principally on the fact that all of the appellants had advanced firefighter training and were required as part of their job duties to be available to assist with fire suppression if needed.  Id. at *8.

The case before us is fundamentally different.  Here, there is no dispute that the appellants are not fully cross-trained or dual function firefighter/paramedics.  The FSPs have not received advanced firefighter training.  They are not certified firefighters.  In Huff, all of the appellants were certified firefighters, and even had training beyond that required for a firefighter.  Moreover, the FSPs are not authorized to staff fire apparatuses; they staff ambulances.  In Huff, the appellants not only staffed fire apparatuses, but they were permitted to do so

28

without additional firefighter support. Finally, in this case, the FSPs are called to a fire scene only for the purpose of providing medical care, whereas in <u>Huff</u>, the firefighter/paramedics and fire medics were called to the scene and were then assigned to duties, which could have ranged from fire suppression to providing medical care.

Although the two cases share some similar facts, that must not overshadow the greater overarching distinction between the two cases, namely, that the plaintiff-appellants in <u>Huff</u> were without a doubt firefighters who also performed paramedic duties (and thus should come within the exemption based upon the statute's legislative history and purposes), whereas the plaintiff-appellants in the instant case are not firefighters at all, but are single function paramedics who happen to be employed by a fire department (and thus do not come within the exemption).

4.     DOL Opinion Letter

In a DOL Opinion Letter dated June 1, 2006, <u>see</u> Appellants' Br. Addendum 4, the DOL responded to a hypothetical question and opined that the dual function paramedics posed in the hypothetical fell within the § 207(k) exemption.[6] In the hypothetical, the dual function paramedics were hired as firefighters, were required to attend the full

_____

[6] "Interpretations such as those in opinion letters--like interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law--do not warrant <u>Chevron</u>-style deference." <u>Christensen v. Harris County</u>, 529 U.S. 576, 587 (2000). Instead, the lesser degree of deference called for by <u>Skidmore v. Swift</u>, 323 U.S. 134 (1944), is appropriate. The <u>Skidmore</u> rule provides "[t]he weight of [an agency's] judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade if lacking power to control." <u>Id.</u> at 140.

seventeen-week firefighter training course, and, unlike the paramedics in <u>Cleveland</u>, wore fire protection gear and carried breathing apparatus. Significantly, the hypothetical dual function paramedics were routinely ordered to perform fire suppression duties and were ordered to all fire scenes. Thus, the factual scenario upon which the DOL opinion letter was based was substantially different from the scenario in <u>Cleveland</u> and from that before us.

B.      <u>Legal Authority and Responsibility</u>

Before we can uphold the District Court's decision that the FSPs fall within the exemption of the FLSA, we must determine whether the City met its burden to prove plainly and unmistakably that the FSPs have legal authority and responsibility to engage in fire suppression activities, a prerequisite for finding they are not covered by the overtime provision of the FLSA. <u>See</u> <u>Corning Glass Works</u>, 417 U.S. at 196-97; <u>Arnold</u>, 361 U.S. at 392. The District Court stated that "[t]he parties agree that paramedics have only been called upon infrequently to aid in fire suppression," but it nonetheless held that FSPs have such legal authority and responsibility because "it is beyond dispute that fire service paramedics have, on occasion, been directed to aid in fire suppression, and when directed have done so." <u>Lawrence</u>, 2006 WL 2847330, at *3. We believe considerable more analysis of the record is required before that conclusion can be upheld.

Because we are interpreting a statute, we need to "discern legislative intent," considering first the plain meaning of the statutory text. <u>Morgan v. Gay</u>, 466 F.3d 276, 277 (3d Cir. 2006). "Plain meaning" means the "ordinary" usage of a term. <u>See</u> <u>Alaka v. Attorney Gen. of United States</u>, 456 F.3d 88, 104 (3d Cir. 2006) (citation and internal quotation marks omitted) ("Perhaps the most fundamental principle of statutory construction is that words in a statute must be given their ordinary meaning whenever possible."). The plain meaning of the text should be conclusive, except in the rare instance when the court determines that the plain meaning is ambiguous. <u>Morgan</u>, 466 F.3d at 278. If so, the court can consider

30

legislative history but should do so "with caution." Id.

As we discussed above, the Ninth Circuit in Cleveland, after consulting various dictionaries,[7] stated that "'responsibility to engage in fire suppression'" meant that the paramedics must have "some real obligation or duty," and it held that Los Angeles had not met its burden of showing that the paramedics in that case had the "'responsibility' to engage in fire prevention, control or extinguishment" as required by the DOL regulation and § 203(y). 420 F.3d at 990-91. We also conclude that the plain and ordinary meaning of the term legal "responsibility" in § 203(y)(1) is unambiguous. In order to be responsible for something, a person must be required to do it or be subject to penalty. Cleveland, 420 F.3d at 989 (citing Webster's New World Dictionary, Third College Edition (1986)). In other words, a responsibility is something that is mandatory and expected to be completed as part of someone's role or job.

Applying that definition to the facts in the record, we cannot sustain the District Court's holding that the City has shown that the FSPs have the legal responsibility to engage in fire suppression. There is substantial evidence to the contrary. FSPs are not hired to fight fires, not even in small part; indeed, they are not expected to fight fires as part of their job duties. The job description makes no mention of fire suppression duties, but rather is medical in nature. There is no evidence of an FSP being disciplined for not engaging in fire suppression activities at a fire scene. There is no evidence that FSPs are ever dispatched to a fire scene for the purpose of fighting a fire, not even in situations when a firefighter is unavailable. There is some evidence that occasionally an incident commander may ask an FSP to help move a fire hose or that an FSP may volunteer to assist if s/he is standing by waiting to perform paramedic duties. Nevertheless, there is no evidence in the record to support the

_____

[7] This court has also held that it is permissible to use a dictionary to determine a term's plain meaning. See Berckeley Invest. Group, Ltd. v. Colkitt, 259 F.3d 135, 142-43 n.7 (3d Cir. 2001).

31

assertion that the FSPs are expected to engage in fire suppression as part of their job duties or that they are subject to penalty if they do not do so. Indeed, FSPs are not even called to every fire scene, and when they are, their duty, as described in their job description and Department directive, is to provide medical care.

The City has argued that because the Fire Commissioner stated that FSPs are expected to engage in fire suppression when ordered to do so by the incident commander, they therefore have responsibility and authority. That is a non sequitur. An FSP's assistance in moving hose line in an emergency situation does not make the FSP legally responsible for fire suppression. Such minor assistance is not the "role" or required duty of an FSP, and therefore does not fall within the plain meaning of the term "responsibility." To conclude that an FSP has responsibility for fire suppression activities principally because the incident commander theoretically has authority to tell an FSP to do anything at the scene of a fire would require speculation regarding an FSP's responsibility to engage in fire suppression, which is not permitted on summary judgment. Ridgewood Bd. of Educ. v. N.E. ex rel M.E., 172 F.3d 238, 252 (3d Cir. 1999). Theoretical possibilities are not evidence. Congress could have chosen to make all paramedics subject to the exemption, but it did not; the plain language of the statute connects the exemption to fire suppression.

The mere fact that certain FSPs were required to sign a statement that provided that they would be responsible for fire suppression duties does not mean that FSPs have legal authority and responsibility to engage in fire suppression activities; it simply means that the Fire Department required them to sign such a statement in order to retain their jobs. Saying something does not necessarily make it so. Here, the record evidence does not support the claim that the FSPs were actually legally responsible for fire suppression activities.

Appellants do not argue that the small subset of FSPs that were at one time firefighters and then crossed over to become paramedics were not trained in fire suppression, as they clearly

32

were when they became firefighters. Rather, Appellants argue that these cross-over individuals do not currently have responsibility for fire suppression because their sole job now is to function as a paramedic. We agree. There is no evidence that they are dual function paramedics who still operate as firefighters part of the time.

Although we conclude that the statutory language is plain, in an abundance of caution we look to the legislative history which, on this issue, suggests that Congress intended that true dual function paramedics, that is, individuals who were no doubt firefighters but also performed various other functions within a fire department, would fall within the exemption.[8] That may explain why the language of the exemption covers not only firefighters but also paramedics, emergency services personnel, etc. Review of the congressional debates reinforces our conclusion that § 203(y) was added to clarify that dual function paramedics are to be exempt from the FLSA overtime provision and are to be treated as firefighters, whereas paramedics are entitled to the time-and-a-half overtime pay. Representative Erlich noted that the definition of a fire protection employee required clarification because of:

the range of lifesaving activities engaged in by today's

---

[8] The dissent suggests, erroneously, that our construction of § 203(y)(1) will render the second part of § 203(y)(2) superfluous. A true dual function paramedic and firefighter may be both a firefighter and paramedic because of his or her training and experience in both fields. Although s/he would have the authority to fight fires (as required by § 203(y)(1)), s/he may not be "engaged" in fighting fires as required by the first part of § 203(y)(2) because the municipality chooses to utilize the individual in his/her capacity as a paramedic. Nonetheless, a true dual function firefighter and paramedic fits within the second part of § 203(y)(2) as s/he will "respon[d] to emergency situations." Congress made clear its intent to exempt such individuals, which can be accomplished only because they fit within both prongs of § 203(y).

fire service, built upon its long tradition of responding to all in need of help. Specifically, today's firefighter, in addition to fire suppression, may also be expected to respond to medical emergencies, hazardous materials events, or even to possible incidents created by weapons of mass destruction.

145 Cong. Rec. at 28,521. He concluded that:

[The bill] only affects those who are trained, prepared and have the legal authority to engage in fire suppression, but also work to save lives in so many other ways.

Id.

Here, there is no dispute that the FSPs are paramedics who have some level of fire suppression exposure but who are by no means firefighters. The evidence shows that they "are not cross-trained as firefighters," and therefore, as Representative Clay stated, they "will remain outside the purview of [§ 207(k)] and will be entitled to overtime after 40 hours a week, even [though] the emergency medical services are placed within the fire department." Id. at 28,520.

The decision in Cleveland is not directly analogous to this case because those plaintiffs were fully trained firefighters,[9] but we consider that opinion because of the similarity of many of the facts and the issue. FSPs are dispatched to a fire scene only when it is deemed necessary to have medical personnel on site. They do report to many other kinds of emergency scenes and, in fact, fire emergencies make up only .1% of FSP dispatches per year. Finally, to the extent that some FSPs do have prior training as firefighters, the dispatcher has no idea which FSPs s/he calls to report to a fire scene. It cannot fairly be said that the FSPs have a real obligation to fight fires because it is not what they

_____

[9] Thus, the fact that the Cleveland plaintiffs did not wear bunker gear, as the plaintiffs in this case do, is not really an accurate point of comparison, given that the Cleveland plaintiffs were fully trained firefighters.

34

were hired to do and it is not what they are expected to do as part of their job duties. Therefore, we conclude that the FSPs do not have responsibility for fire suppression activities. As such, the City has failed to meet its burden of proof to show that it falls within the § 207(k) exemption, and the District Court erred in granting the City summary judgment.

Because we have decided that Appellants were not responsible for fire protection activities as a matter of law, it also follows that the District Court erred by not entering summary judgment in their favor. It was the City's burden to demonstrate that it met all three requirements necessary to qualify for the exemption. It is not necessary to reach the question whether Appellants were "trained" in fire suppression because the City has failed to meet one of the requirements. We conclude that FSPs are not exempted from the overtime provision of the FSLA.

## IV.
## Conclusion

Both parties have agreed that there are no disputed issues of material fact. Although there may be some dispute in the margins regarding certain facts pertaining to the authority and responsibility of the FSPs, those disputes are not material. We have searched the record conscientiously, but have been unable to find any general issue of material fact. For the above stated reasons, we will reverse the judgment of the District Court and direct the District Court to grant summary judgment on liability for Appellants.

The parties agreed at oral argument that if we were to reverse the District Court's finding with respect to liability, we would need to remand to the District Court to make further findings regarding damages, including the issue whether the City acted willfully, see 29 U.S.C. § 255(a),[10] and the issue whether

---

[10] This provision of the FLSA extends the statute of limitations from two to three years.

the City qualifies for a good faith defense, see 29 U.S.C. § 258,[11] under the FLSA.  It is important to note that if the City can show that it acted in good faith, it may not be subject to damages for its past overtime pay practice, as Congress was plainly concerned with local governments being liable for substantial back pay awards. We assume that the numerous City amici share that concern.  If the City can prove its entitlement to the FLSA good faith defense with respect to its past practice, we are confident that creative City officials can work with the union to fashion future work schedules compatible with the FLSA.

Accordingly, we will remand for further proceedings consistent with this opinion, including those relevant to the questions of willfulness and good faith with respect to the issue of damages.

---

[11]  This provision of the FLSA establishes a good faith defense for an employee who fails to pay overtime because of, inter alia, reliance on an administrative practice or agency interpretation.

HARDIMAN, *Circuit Judge*, dissenting.

The majority holds that Philadelphia's Fire Service Paramedics (FSPs) are non-exempt employees under Section 203(y) of the Fair Labor Standards Act because they spend a *de minimis* amount of their time actually engaged in fire suppression activities. In my view, we must ask whether an FSP has the "responsibility" to engage in fire suppression and the answer to this question does not depend upon how much time an FSP actually spends on such activities. In concluding that FSPs must be on the front lines of firefighting to have "responsibility to engage in fire suppression," the majority is unfaithful to the text, structure, and legislative history of the 1999 amendments to the Fair Labor Standards Act. Consequently, the majority's approach exposes municipalities to the same unnecessary and potentially staggering damage awards that Congress intended to prevent. I respectfully dissent.

I.

This appeal forces us to choose sides in an emergent circuit split regarding the interpretation of the phrase "responsibility to engage in fire suppression" as used in § 203(y) of the Fair Labor Standards Act (FLSA), 29 U.S.C. § 201 *et seq*. As the majority thoroughly discusses, in *Cleveland v. City of Los Angeles*, 420 F.3d 981 (9th Cir. 2005), the Ninth Circuit found that "for Plaintiffs to have the 'responsibility' to engage in fire suppression, they must have some real obligation or duty to do so. If a fire occurs, it must be their job to deal with it." *Id.* at 983. Contrary to *Cleveland*, the Fifth Circuit stated in *McGavock v. City of Water Valley*, 452 F.3d 423 (5th Cir. 2006), that emergency personnel trained as firefighters could be considered exempt "even though they may spend one hundred percent of their time responding to medical emergencies." *Id.* at 427. Following oral argument in the present appeal, the Eleventh Circuit sided with the Fifth Circuit, stating that "responsibility" is a "forward-looking, affirmative duty or obligation that an employee may have at some point in the future" or a "duty which one may or may not ever be called upon to perform." *Huff v. DeKalb County*, 516 F.3d 1273, 1281 (11th Cir. 2008). Accordingly, the Eleventh Circuit stated that the exemption does not require that there be "*any* level of

37

engagement in fire suppression." *Id.* (emphasis in original).

In this case, by stating that "responsibility is something that is mandatory and expected to be completed as part of someone's role or job," Maj. Op. at 31, the majority has essentially adopted the Ninth Circuit's dictionary definition-based analysis of the statutory term "responsible." Under the majority's view, FSPs cannot be "responsible" for fire suppression unless they are "hired to fight fires," are "expected to fight fires as part of their job duties," and have "fire suppression duties" as part of their job description. *Id.* Providing emergency support at a fireground — such as moving hose line — is insufficient because it is not the "role" or "required duty" of an FSP. *Id* at 32. Although not explicitly stated, the majority effectively requires evidence that employees actually engage in fire suppression on a regular basis. The possibility that an FSP might "theoretically" or "periodically" be ordered by a superior officer to engage in fire suppression is not enough. This approach is contrary to the Eleventh Circuit's view, under which it suffices if one employed by a fire department "may . . . at some point in the future" be called upon to engage in fire suppression, regardless of whether that person has ever done so in the past. *Huff*, 516 F.3d at 1281.

In my view, the majority's construction is supported by neither the text and structure of § 203(y) nor the dictionary definition of "responsibility." Although FLSA exemptions are to be construed narrowly, the majority categorically renders non-exempt many fire department employees — paramedics, emergency medical technicians, rescue workers, ambulance personnel, and hazardous materials workers — despite Congress's attempt to broaden the exemption. Indeed, the majority's interpretation of the statute renders superfluous the final provision of § 203(y)(2), which provides that an employee is exempt if he or she is "engaged in . . . the response to emergency situations where life, property, or the environment is at risk."

## II.

I have no quarrel with the majority's use of dictionary definitions as an aid in construing undefined statutory terms. But none of the dictionary definitions suggested by either the Ninth or Eleventh Circuits leads inexorably to the conclusion

that employees must actually fight fires to be responsible for fire suppression.  In *Cleveland*, the Ninth Circuit noted that "responsibility" has been defined as "a duty, obligation or burden," "[a] charge, trust, or duty, for which one is responsible," "[l]iability," or "[a] thing or person that one is responsible for." *See Cleveland*, 420 F.3d at 989 (internal citations omitted).  To this list, the Eleventh Circuit added a "moral, legal, or mental accountability." *Huff*, 516 F.3d at 1280 (internal citation omitted).  The Ninth Circuit also observed that "responsible" means "expected or obliged to account (for something, to someone), answerable, accountable" and "involving accountability, obligation or duties," and may apply "to one who has been delegated some duty or responsibility by one in authority and who is subject to penalty in case of default" or something one is "required to do as part of a job, role or legal obligation." *Cleveland*, 420 F.3d at 989 (internal citation omitted).  "Responsible" can also mean "having an obligation to do something, or having control over or care for someone, as part of one's job or role." *Id.* (internal citation omitted).

Only a few of the foregoing definitions support the majority's suggestion that fire suppression must be part of the employee's formal role, and none suggests that fire suppression must be the employee's principal function (*i.e.,* the employee must be "hired to fight fires").  Nor do these definitions imply that an employee is not "responsible" if the performance of the duty or burden is contingent upon a future occurrence that may never come to pass.[12]  It may be sufficient if the employee is subject to a duty to engage in fire suppression at some point in

---

[12] Numerous jobs make employees "responsible for" doing something that they may never have occasion to do, or may only do when other employees with primary responsibility for a task have failed or are otherwise unavailable.  Air marshals are "responsible for" apprehending and disarming terrorists on aircraft, even though they rarely, if ever, have to do so and would be called upon to do so only if other aviation security officials had failed to stop an armed terrorist from boarding an airplane.  Likewise, members of a police bomb squad are "responsible for" disarming explosives even if no bomb is ever planted.

39

the future, whether that duty is the employee's primary role or not.

Even if the dictionary definitions offered a clearer answer to the question before us, we must begin with the text and structure of the statute. "There is a limit . . . to how much can be proved by invoking dictionary definitions and usage." *United States v. Loney*, 219 F.3d 281, 285 (3d Cir. 2000). As the Supreme Court has instructed, we examine "not only the bare meaning of the word but also its placement and purpose in the statutory scheme," bearing in mind that "[t]he meaning of statutory language, plain or not, depends on context." *Id.* at 285 (quoting *Bailey v. United States*, 516 U.S. 137, 145 (1995) (internal quotations and additional citations omitted)). Moreover, when examining the statutory text and structure, we must be careful to avoid a construction that renders any part of the statute superfluous. *Pa. Dep't of Public Welfare v. U.S. Dep't of Health & Hum. Servs.*, 928 F.2d 1378, 1385 (3d Cir. 1991).

Reviewing § 203(y) with these principles in mind, I find that the phrase "responsibility to engage in fire suppression" cannot mean, as the majority suggests, that the employee's *primary* role and function is to engage in fire suppression. The statute states:

> "Employee in fire protection activities" means an employee, including a firefighter, paramedic, emergency medical technician, rescue worker, ambulance personnel, or hazardous materials worker, who--
>> (1) is trained in fire suppression, has the legal authority and responsibility to engage in fire suppression, and is employed by a fire department of a municipality, county, fire district, or State; and
>> (2) is engaged in the prevention, control, and extinguishment of fires or response to emergency situations where life, property, or the environment is at risk.

29 U.S.C. § 203(y). Subsection (1) of § 203(y) is phrased conjunctively. Accordingly, all employees falling within the exemption must be (a) trained in fire suppression, (b) have the legal authority and responsibility to engage in fire suppression; *and* (c) be employed by a public fire department. By contrast,

subsection (2) of § 203(y) is phrased disjunctively. Thus, in addition to meeting *all* of the requirements of § 203(y)(1), an exempt employee must also be (a) engaged in the prevention, control, and extinguishment of fires; *or* (b) engaged in the response to emergency situations where life, property, or the environment is at risk.

The majority's construction of subsection (1) would render the second part of subsection (2) entirely superfluous. If employees must satisfy § 203(y)(1) by being "hired to fight fires" and "expected to fight fires as part of their job duties," it necessarily follows that they are "engaged in the prevention, control, and extinguishment of fires" and the first clause of § 203(y)(2) is redundant. More problematically, the majority's requirement that exempt employees actually engage in fire suppression renders superfluous the phrase "or response to emergency situations where life, property, or the environment is at risk." As the Eleventh Circuit observed, the use of the disjunctive in § 203(y)(2) demonstrates that "there is no statutory requirement that there be *any* level of actual engagement in fire suppression." *Huff*, 516 F.3d at 1281. An employee may become exempt either by fighting fires *or* by responding to emergency situations where lives, property, or the environment are at risk. Controlling and extinguishing fires would, of course, also involve such emergency situations. Yet the use of the disjunctive word "or" shows that an employee who responds to emergency situations other than firefighting may be exempt. *See United States v. Hodges*, 321 F.3d 429, 436 (3d Cir. 2003) ("[C]anons of construction ordinarily suggest that terms connected by a disjunctive be given separate meaning unless the context dictates otherwise.") (citation omitted). Were it otherwise, Congress could have omitted that provision entirely or used the conjunctive "and." In sum, the majority's interpretation effectively ignores the final clause of § 203(y)(2) and makes engaging in fire suppression the *sine qua non* of the exemption.

In an attempt to demonstrate that its construction does not render the second part of § 203(y)(2) superfluous, the majority posits a hypothetical employee who is "both a firefighter and a paramedic because of his or her training and experience in both fields," but whom the municipality chooses to use "in his/her

41

capacity as a paramedic." Maj. Op. at 33 n.8. Such an employee would fall within the exemption without engaging in fire suppression because s/he would have the authority to fight fires and would "respon[d] to emergency situations" as required by the second part of § 203(y)(2). *Id.* In so concluding, the majority overlooks its own definition of "responsibility," which requires that the employee be "hired to fight fires" and *actually* engage in firefighting. If the fact that a paramedic had prior training and experience as a firefighter sufficed, then the "authority and responsibility" prong of § 203(y)(1) would become superfluous and being "trained in fire suppression" would become the *sine qua non* of the exemption.[13]

To avoid rendering statutory language superfluous, the phrase "responsibility to engage in fire suppression" must mean something different than that ascribed to it by the majority. I find persuasive the broader constructions offered by the Fifth and Eleventh Circuits. Employees are subject to the exemption without ever having actually engaged in fire suppression, so long as they may have a "forward-looking, affirmative duty or obligation" to do so at some point in the future, *id.* at 1281, even if they presently "spend one hundred percent of their time responding to medical emergencies." *McGavock*, 452 F.3d at 427.

This construction is consistent not only with the use of the disjunctive in § 203(y)(2), but also with the statutory language indicating that various emergency responders fall within the ambit of the exemption. The introductory sentence of § 203(y) explicitly states: "'Employee in fire protection activities' means an employee, including a firefighter, *paramedic, emergency*

_____

[13] The majority's approach in this regard has consequences in this case. Some forty Plaintiffs are, like the hypothetical employee posited by the majority, firefighters who transferred into the FSP program to work as paramedics. Because these Plaintiffs concede that they have been "trained in fire suppression," Br. of Appellants at 28 n.6, to be consistent with its analysis, the majority should affirm the District Court's grant of summary judgment as to them.

42

*medical technician, rescue worker, ambulance personnel, or hazardous materials worker.*"  29 U.S.C. § 203(y) (emphasis added).  Congress's enumeration of various job titles, in addition to that of firefighter, undermines the majority's conclusion that the exemption applies only to employees hired exclusively, primarily, or periodically "to fight fires."[14]

### III.

The majority attempts to bolster its analysis of § 203(y) by relying upon legislative history, which supposedly shows that the exemption is intended to apply only to employees who are traditional firefighters but who may engage in emergency medical and rescue work as well.  I do not read the legislative history to support this view.

The record is scant, with only three Congressmen making brief floor statements in support of the bill.  But it is clear that the sponsor and the floor manager of the 1999 amendment to the FLSA were motivated primarily by several court cases in which emergency medical service personnel employed by fire departments had been found non-exempt under the Department of Labor's 80/20 rule, which provided that medical service personnel did not fall within the exemption if 20% or more of their time was spent responding to medical emergencies unrelated to fire protection.  The bill's sponsor stated:

> The issue addressed by H.R. 1693, Mr. Speaker, concerns fire department paramedics trained to fight fires who have prevailed in several suits for overtime compensation under the FLSA.  The paramedics successfully argued they were not fire protection employees covered by the FLSA exemption since

---

[14]  Drawing on the legislative history of § 203(y), the majority asserts that this language  was included to make clear that the exemption covers only "individuals who were no doubt firefighters but also performed various other functions within a fire department." Maj. Op. at 33.  This construction is at odds with the plain language of the provision.  By including "firefighter" as a separate job title and using the disjunctive "or," the statute provides that an employee may fall within the scope of the exemption even if not a traditional "firefighter."

43

> more than 20 percent of their normal shift time was spent engaged in emergency responses rather than firefighting, such as emergency medical calls.

145 Cong. Rec. H11,500 (daily ed. Nov. 4, 1999) (statement of Rep. Ehrlich). Representative Ehrlich noted that a municipality in his district had recently been found liable for $3.5 million under the FLSA, and that the potential consequences of such cases were "serious and far-reaching and could result in a dramatic increase in the local costs of fire protection to taxpayers nationwide." *Id.* Another representative made a similar point, observing that the narrowing of the exemption by the courts had "resulted in State and local governments being liable for millions of dollar in back pay, attorneys fees and court costs." *Id.* (statement of Rep. Boehner).

Representatives also emphasized that the recent trend of cases was contrary to the historical understanding that *all* emergency responders employed by a fire department were included within the exemption, regardless of whether they were engaged in direct fire suppression: "[h]istorically, any emergency responder paid by a fire department was considered to be a fire protection employee. However, recent court interpretations of Federal labor statutes have rendered this definition unclear." *Id.* (statement of Rep. Ehrlich). EMS personnel had fit within the exemption "[i]n the past" but the more recent decisions had "narrowly interpreted the 7(k) exemption and held that emergency medical services personnel do not come within the exemption because the bulk of their time is spent engaged in nonfire protection activities." *Id.* (statement of Rep. Boehner).

Finally, Congress made clear that the bill's clarification of the exemption was specifically intended to remedy the precarious situation in which the recent court cases had placed municipal fire departments. The bill's sponsor characterized the amendment as "a remedy . . . for an increasingly serious situation." *Id.* (statement of Rep. Ehrlich). And Representative Boehner cited the millions of dollars in potential liability for state and local governments in arguing that "there is a real need to modernize this area of the Fair Labor Standards Act and to clearly specify who can be considered a fire protection employee for purposes of the exemption." *Id.*

In short, the legislative record suggests that § 203(y)'s supporters sought to reverse the trend of court cases in which the exemption — which historically had included *any* emergency

responder employed by a fire department — had been narrowed, resulting in large damage awards against municipalities.[15] And in clarifying the exemption, Congress intended to overturn much of the recent caselaw in favor of the more inclusive approach that had prevailed historically under the FLSA. *See* H.R. Rep. No. 106-1040, at 102 (2001) (describing the 1999 amendment as a "simple and non-controversial bill to clarify section 7(k) of the Fair Labor Standards Act and restore the original intent of the overtime provisions for employees engaged in fire protection activities"). This may explain why § 203(y) was drafted to bring more fire department employees within the ambit of the exemption. *See Vela v. City of Houston*, 276 F.3d 659, 674 (5th Cir. 2001) (noting that "under the current FLSA, more employees fall within the § 207(k) exemption, and fewer employees are entitled to compensation pursuant to the FLSA general rule").

The majority's approach is contrary to the intent of the 1999 amendments to the FLSA. Rather than broadening and simplifying the exemption, the majority renders an entire class of employees — *viz.*, fire department employees who perform emergency response functions but who do not directly "fight fires" — categorically ineligible for exempt status. Such employees were eligible for exempt status even before the 1999 amendments.[16] This is directly

---

[15] It bears mentioning that the potential damage awards under the prior regulations were staggering. For example, the City of Houston was required to pay nearly $100 million in backpay to its dual-function personnel. *See* Br. of Amici at 11-12. Under the majority's interpretation of § 203(y), the threat of such damage awards is renewed. *See* Br. of Amici at 7-9 (explaining that the Ninth Circuit's decision in *Cleveland*, if applied nationally, would cost municipalities $500 million per year in overtime, administrative, and litigation costs).

[16] *See Falken v. Glynn County*, 197 F.3d 1341, 1347 (11th Cir. 1999) (explaining that there are "two categories of cases," one in which "employees are EMS workers only" and one in which employees "are capable of acting, and in fact do act, as both firefighters and EMS workers"); *see also* 29 C.F.R. §553.210 (exemption "would also include rescue and ambulance service personnel if such personnel form an integral part of the public

45

at odds with the legislative history, wherein the supporters of the 1999 amendment expressed their desire to *expand* the number of exempt persons rather than *narrow* the exemption.[17] Therefore, the majority's analysis finds no support in the legislative history of § 203(y).

IV.

Applying the broader definition set forth by the Fifth and Eleventh Circuits to the facts before us, I find that Plaintiffs have the "responsibility to engage in fire suppression." Like the defendant in *Huff*, the City of Philadelphia uses the Incident Command System, a management tool recommended by the National Fire Protection Association (NFPA), at all of its firegrounds. Philadelphia Fire Department Operational Procedure #19 establishes guidelines for the implementation of the Incident Command System and places overall management of an incident in the hands of the "Incident Commander." The Incident Commander's "primary consideration is the accountability of all members which will be attained through appropriate control and the monitoring of personnel while operating on the Fireground." The FSP job description places them under the authority of fire officers, stating that cooperation with fire authorities is "of major significance to this work" and that "[w]ork is performed under the

---

agency's fire protection activities"); *Lang v. City of Omaha*, 186 F.3d 1035, 1038 (8th Cir. 1999) ("Simply because the division of labor and the development of specialties at a fire scene relegates the paramedics to a medical support function does not mean that they are any less directly concerned with the firefighting effort than the individual who runs into a burning building with a hose").

[17] Indeed, the majority's approach would compel the same result in *West v. Anne Arundel County*, 137 F.3d 752 (4th Cir. 1999), the very case that motivated Representative Ehrlich to sponsor the 1999 amendment. The EMTs in *West* spent more than eighty percent of their time responding to non-fire emergencies, and were prohibited by standard operating procedures from engaging in fire suppression when they did respond to fire emergencies. *Id.* at 761. Under the majority's approach, these employees would be non-exempt because they are not "hired to fight fires."

general supervision of an administrative or technical fire officer." And both current Commissioner Lloyd Ayers and former Commissioner Harold Hairston made clear that the Incident Commander possesses broad discretion to "direct or redirect any fire service person, fire service paramedic, or firefighter, in any manner he or she believes will result in the safest environment for civilians and firefighters and efficient suppression of fire," and that FSPs were accordingly authorized "to engage in fire suppression on firegrounds if needed and as directed by an Incident Commander."

Consistent with the statements of Commissioners Ayers and Hairston, Plaintiffs repeatedly acknowledged their obligation to comply with orders of the Incident Commander and other superior officers on a fireground, even if these orders required them to engage in fire suppression activities:

• James MacMullan stated that "[i]t's my responsibility" to follow the orders of the Incident Commander, lieutenants, and captains on a fireground. If he failed to follow an order from a lieutenant or captain to carry hose line, he would "be reported."

• Michael Brooks testified "you have to follow orders" and that he would stretch hose line or be on the nozzle of a hose on a fireground if he were ordered to do so by a chief.

• Lawrence Amaker testified that, while he has never been ordered to assist a firefighter by an Incident Commander, he would follow such an order "[b]ecause we have a job to do."

• Duane Boyes acknowledged that he would serve "on the tip of a nozzle of a hose at a fire ground" if ordered to do so, and that he would be disciplined if he did not follow an order by an Incident Commander.

• Richard Lawrence acknowledged that he is under the command of an Incident Commander and would follow a direct order to move a hose or position a ladder. If he failed to follow such an order, he believed he would be disciplined.

• William Brent, Jr. testified that "[d]isobeying an order from an incident commander under any capacity is subject to discipline," and that he would be obligated to assist a

47

firefighter if ordered to do so by an incident commander.

- Lawrence Bloomfield acknowledged that he is "required to adhere to orders of whoever is in charge of the fire ground." If ordered to do so, he would assist a firefighter in raising a ladder or holding a hose.

- Francis Hanna said he would comply with an Incident Commander's instructions to assist a firefighter with a hose because "that's the way we're taught, to follow the order and then question it later."

- Jeffrey Della Penna testified that he is always under the authority of the Incident Commander and, if ordered to do so, he would carry hose, hold ladders, and enter a burning building to assist with removing a fire victim.

- Arthur Seeger conceded he would comply with an order to move a hose and could possibly be "reported for defiance of a superior officer" if he did not.

- Raymond Mulderig, apparently the only FSP deposed who is not also a Plaintiff, said he would comply with an order to carry a hose or serve on the tip of a nozzle.

On this record, no reasonable finder of fact could conclude that Plaintiffs do not have a "forward-looking, affirmative duty or obligation" to engage in fire suppression if ordered to do so. Or, to use the language of the majority opinion, FSPs ordered to engage in fire suppression are required to do so or be subject to a penalty. This conclusion is reinforced by record evidence suggesting that FSPs have, on occasion, actually engaged in fire suppression activities at the direction of superior officers. For example, Plaintiff Boyes was once asked by a chief or lieutenant to help stretch a hose line. During another incident, a captain asked Plaintiff Boyes to help hook up a hose line to a hydrant. Finally, Plaintiff MacMullan indicated he had been instructed to feed hose line into a building "a few times." As I have explained, the fact that such instances are relatively rare is immaterial under a proper interpretation of § 203(y)(1).

I am also unpersuaded by the majority's emphasis on the

rarity with which FSPs are dispatched to fire scenes.[18]  For one, there is no support in either the statutory text or the legislative history for the notion that exempt employees must be "regularly dispatched to fight fires."  Rather, the legislative history of § 203(y) suggests that Congress intended to reject the Department of Labor's 80/20 rule and those judicial precedents that had found employees non-exempt because they spent most of their time performing non-firefighting functions.  The rule announced by the majority today effectively resurrects the 80/20 rule in another form, but without the virtue of delineating precisely how often employees *would* have to engage in fire suppression activity in order to qualify for the exemption.[19]

Indeed, the majority offers little guidance to municipalities attempting to classify properly their emergency responders under the FLSA and avoid the potentially staggering damage award that

---

[18]  The majority somewhat understates the importance of FSPs in the City's fire suppression strategy.  It is true that FSPs will only be dispatched to a garden-variety fire incident if it is deemed necessary.  But EMS Procedure #11 states that the City Fire Communications Center (FCC) will dispatch a second medic unit  "[w]henever an emergency escalates to the second alarm."  This suggests that FSPs are required —  that is, they have the authority and responsibility —  to respond to at least some fire incidents, and  §  203(y) contains no requirement that exempt employees respond to all or even most incidents.

[19]  The majority notes that FSP dispatches to fire scenes account for only about one-tenth of one percent of FSP ambulance dispatches every year.  Maj. Op. at 11.  But even if FSPs were dispatched to *every* fire call received by the department, it is likely that FSPs would still spend an overwhelming majority of their time on medical calls because only about seven percent of calls received by fire departments nationwide are for fire suppression, while approximately 62% are for medical aid.  Br. of Amici at 6.  The majority takes issue with the use of such national statistics, but ignores the larger point: the frequency with which paramedics are dispatched to fire scenes will be, in nearly all cases, quite low, and thus attaching significance  to this factor risks making paramedics categorically ineligible for the exemption.

49

will be visited upon the City of Philadelphia in this case. But it would appear that, to avail itself of the exemption, an employer could simply dispatch paramedics to every fire incident whether or not emergency medical care is required, and require these paramedics to engage in actual fire suppression periodically. I do not believe Congress intended to require employers to engage in such wasteful measures for the sole purpose of ensuring that emergency responders were deemed exempt under the FLSA. *See Huff*, 516 F.3d at 1281 (requiring that exempt employees actually fight fires would result in emergency responders occasionally being assigned to fire suppression duties "for the sole purpose of exempting them from the FLSA forty-hour overtime standard").

Nor do I find persuasive the majority's attempt to minimize the significance of the Eleventh Circuit's holding in *Huff*. It is true that there was no dispute in *Huff* that plaintiffs were fully trained and certified in fire suppression and even had training beyond that required by state law, but the majority rests its holding on its construction of "responsibility," and purports to avoid the issue of whether Plaintiffs here were trained in fire suppression. As I explain *infra*, it cannot reasonably be disputed that FSPs receive some training in fire suppression, and § 203(y) does not require employees to be fully certified.

The majority also claims that the *Huff* plaintiffs staffed fire apparatuses and were permitted to do so without additional firefighter support, but overlooks the fact that this was true for only three of the six plaintiffs. Those plaintiffs who met the less rigorous firefighting training standards, which the court described as "the NPQI Plaintiffs," were assigned only to rescue vehicles which, like the ambulances in which Philadelphia FSPs ride, carry only protective "turn-out" gear and little or no fire suppression equipment. *Huff*, 516 F.3d at 1275. The NPQI plaintiffs were not assigned to fire engines. *Id.*

Finally, the majority claims that FSPs are called to a fire scene only for the purpose of providing medical care, whereas the *Huff* plaintiffs could be assigned to duties which could range from fire suppression to providing medical care. But the municipality in *Huff* made precisely the same claim as the City of Philadelphia here, *viz.,* that the plaintiffs could be ordered by an incident commander to engage in fire suppression and had the authority and responsibility to do so if ordered, even though the NPQI plaintiffs

50

had never actually engaged in or been ordered to engage in fire suppression. *Id.* Given that half of the *Huff* plaintiffs had *never* engaged in fire suppression, I cannot accept the majority's claim that the "great overarching distinction" between *Huff* and this case is that the *Huff* plaintiffs "were *without a doubt* firefighters who also performed paramedic duties." Maj. Op. at 29 (emphasis added). The majority makes no attempt to explain why the NPQI plaintiffs in *Huff* are undoubtedly firefighters simply because they have a theoretical duty to comply with an incident commander's order to engage in fire suppression, while the Plaintiffs here, who recognize the same theoretical duty, are undoubtedly *not* firefighters.

V.

Having concluded that Plaintiffs have "authority and responsibility to engage in fire suppression," I must also address whether Plaintiffs are also "trained in fire suppression" under § 203(y)(1). The statute does not define the term, but the parties agree that the plain dictionary meaning of the term "trained" is "to make proficient with specialized instruction and practice." *See* Br. of Appellants at 52; Br. of Appellee at 41. The parties also refer to the Department of Labor's pre-1999 regulation, which requires that employees must be "trained to the extent required by state law" to qualify for the exemption. 29 C.F.R. § 553.210(a)(2). Because I believe that Plaintiffs are adequately trained in fire suppression under either the plain meaning of the term or the pre-1999 regulation, I need not decide whether the Department of Labor's definition is superseded by the 1999 amendments.

It is clear to me that, after completing their training at the Fire Academy, Plaintiffs were trained in and proficient at fire suppression. During the relevant period, at least a few weeks of the FSP Fire Academy program were devoted to fire suppression instruction and activities. Furthermore, the fire examination that all FSP cadets must pass, as well as the fire suppression activities actually (though rarely) engaged in by FSPs in the field, belie Plaintiffs' suggestion that fire suppression training is nothing more than a mere "orientation." The FSP Final Fire Examination contains detailed questions regarding the maximum number of firefighters allowed on certain ladders, the appropriate working angle of such ladders, how to protect oneself from the dangers of flashover, the type of fire hydrants used by the City, the number of

half-turns required to open a fire hydrant and ensure maximum flow, the features of various hose nozzles used by the City, and the use and maintenance of SCBA gear. Once in the field, FSPs were able to perform basic firefighting functions such as hooking up hoses to fire hydrants, unkinking hose line, feeding hoses into burning buildings, holding ladders, and, on a few occasions, serving on the end of a nozzle. That many of these activities were not "condoned" or were engaged in by "freelancing" FSPs does not alter the fact that Plaintiffs were trained to a level sufficient to allow them to perform basic firefighting functions.

Plaintiffs also received fire suppression training "to the extent required by state law." 29 C.F.R. § 553.210(a)(2). It is undisputed that the Commonwealth of Pennsylvania does not require fire departments to comply with the training standards set forth by the NFPA. Instead, state law defers to localities and leaves them free to determine their own standards, as Philadelphia has done here. Although there is some force to Plaintiffs' argument that state law essentially permits the City to claim the exemption while providing "no training at all," Reply Br. at 21, this is not a case where the employer provided virtually no training or engaged in a sham "training" program simply to avoid the overtime requirements of the FLSA.

Nor is it relevant that the training provided to FSPs does not qualify them for any NFPA certification or permit them to serve as front-line firefighters. The statute says only "trained in fire suppression," and not trained "to the level of NFPA 1001" or "to the level that the employer requires of its full-time firefighters." Moreover, interpreting the statute to require uniform or equivalent training standards could have far-reaching and somewhat absurd implications. Fire departments would face the dilemma of either training all personnel in the same advanced firefighting techniques, thereby wasting substantial resources on training that many personnel will rarely use, or tailoring fire suppression training to the needs of individual roles, thereby saving on training costs but forfeiting the FLSA exemption for all but the most highly-trained firefighters. Finally, requiring identical or equivalent training would likely exclude at least some support personnel, such as paramedics, emergency medical technicians, rescue workers, ambulance personnel, or hazardous materials workers: personnel that Congress *explicitly* included in § 203(y).

For all the foregoing reasons, I would affirm the order of the District Court granting summary judgment to the City of Philadelphia.